## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **VASSIL BOJKOV**<br>43 Moskovska Street<br>Sofia 1000<br>Bulgaria<br><br>*Plaintiff,*<br><br>v.<br><br>**BRADLEY T. SMITH, in his official capacity as**<br>**Director of the United States**<br>**Department of the Treasury,**<br>**Office of Foreign Assets Control**<br>1500 Pennsylvania Avenue, NW<br>Freedman's Bank Building<br>Washington, D.C. 20220<br><br>*Defendant,*<br><br>and<br><br>**THE UNITED STATES DEPARTMENT**<br>**OF THE TREASURY, OFFICE OF FOREIGN**<br>**ASSETS CONTROL**<br>1500 Pennsylvania Avenue, NW<br>Freedman's Bank Building<br>Washington, D.C. 20220<br><br>*Defendant.* | Case No. 1:25-cv-3617<br><br>**SECOND AMENDED**<br>**COMPLAINT FOR**<br>**DECLARATORY AND**<br>**INJUNCTIVE RELIEF** |

Plaintiff Vassil Bojkov amended his Complaint for Declaratory and Injunctive Relief against Defendants the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") and its Director, Bradley T. Smith, and in support of his amended complaint alleges the following:

**INTRODUCTION**

1.      Defendant OFAC designated Mr. Bojkov, a private businessman, under Executive Order ("E.O.") 13818 for "bribery" of Bulgarian officials. When the administrative record developed over years of proceedings established that the payments at issue were not voluntary bribes but extortion—payments coerced by a sitting Prime Minister and Finance Minister wielding the apparatus of the Bulgarian state—Defendants accepted the premise, and then discarded the distinction. In doing so, Defendants reasoned that because Mr. Bojkov derived some business benefit from acquiescing to his extorters, the line between voluntary corruption and coerced compliance had ceased to matter. In doing so, Defendants ignored that "while the essence of bribery is voluntariness, the essence of extortion is duress." *United States v. Addonizio*, 451 F.2d 49, 72 (3d Cir. 1971).

2.      Defendants do not grapple with the fact that extortion is effective precisely because the victim derives some benefit from compliance—otherwise the coercive threat would carry no leverage. Ignoring this basic and common understanding, Defendants have departed from their traditional posture of naming and shaming malign actors, to naming and shaming victims to justify their actions. Executive Order 13818, however, was promulgated to combat corruption and to vindicate its victims, not to be wielded against them while the extorters remain undisturbed.

3.      In seeking a reconsideration of his designation, Mr. Bojkov followed Defendant OFAC's published guidance regarding designated parties seeking a "positive change in behavior": 1) he exited the gambling industry; 2) watched the very state instrumentality of the alleged corruption (the SCG) be abolished; 3) severed ties with the officials at the heart of the scheme; 4) surrendered to Bulgarian authorities to face the proceedings he was accused of evading; 5) saw

criminal charges dismissed for lack of evidence; 6) answered four rounds of OFAC questionnaires and supplements over four years; and 7) proposed concrete remedial measures.

4.    In return, Defendants issued a Denial Letter—only after this lawsuit was filed—that refused to identify what changed circumstances would ever be enough; refused to identify what remedial measures would ever be enough; refused to grapple with the coercion-versus-voluntariness distinction at the heart of the corruption inquiry; and outsourced its fact-finding to unfinished foreign investigations and unverified press clippings. As a result of his initial designation and Defendants' denial, Mr. Bojkov continues to suffer concrete and ongoing harm: lost banking relationships, lost commercial partnerships, and a reputation tarnished by the U.S. government.

5.    In this case, Defendants' sanctions designation regime operates as a one-way ratchet—easy to enter, impossible to exit, with the agency reserving the right to speculate about residual benefits from pre-designation wealth and to invoke unspecified "types" of conduct. This view reads the "change in circumstances" pathway in 31 C.F.R. § 501.807 afforded to parties seeking reconsideration of their designation out of the regulations entirely.

6.    Beyond that, and in denying the Petition, the Defendants have engaged in arbitrary and capricious decision making, acted outside of their authority, and have failed to present substantial evidence in support of their action. Accordingly, Mr. Bojkov seeks this Court's intervention to enjoin OFAC from its unlawful maintenance of his designation.

7.    A ruling for Mr. Bojkov would not second-guess OFAC's foreign-policy judgment; it would simply require OFAC to do what every other agency in this Circuit must do—articulate a standard, apply it to the record, distinguish coerced conduct from voluntary corruption, and explain itself. As such, the Court is not being asked to free a sanctioned "oligarch"; it is being asked to

3

ensure that OFAC's delisting process is a real process and that one of the Executive Branch's most devastating legal tools is administered with the minimal reasoned decision-making the APA has required for decades.

## JURISDICTION AND VENUE

8.      This action arises under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.*; the Global Magnitsky Human Rights and Accountability Act, 22 U.S.C. § 2656 *note*; and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

9.      This Court may grant declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and Federal Rule of Civil Procedure 57. This Court may grant injunctive relief in accordance with Federal Rule of Civil Procedure 65.

10.     Venue is proper in the District of Columbia pursuant to 28 U.S.C. §§ 1391(b) and (e), as Defendants reside in the District of Columbia.

## THE PARTIES

11.     Plaintiff Vassil Bojkov is a Bulgarian national who is, and was at all times relevant herein, resident at 43 Moskovska Street, Sofia 1000, Bulgaria. Mr. Bojkov is sanctioned pursuant to E.O. 13818 and his name is included on the SDN List.

12.     Defendant OFAC is an administrative agency of the United States Department of the Treasury, located at 1500 Pennsylvania Ave., NW, Freedman's Bank Building, Washington D.C. 20220. OFAC is responsible for maintaining and administering the SDN List. This includes by placing persons on and removing persons from the SDN List consistent with E.O. 13818, and the implementing regulations located at 31 C.F.R. Parts 501 and 583, the "Reporting, Procedures

and Penalties Regulations" and "Global Magnitsky Sanctions Regulations," respectively. OFAC was responsible for designating Mr. Bojkov under E.O. 13818 and was responsible for denying the Petition.

13.     Defendant Bradley T. Smith is the Director of OFAC. In this role, Director Smith is responsible for overseeing and directing OFAC's operations, including by signing the determination denying the Petition. Director Smith is sued in his official capacity.

## FACTUAL ALLEGATIONS

### A.     OFAC's Designation of Mr. Bojkov Under E.O. 13818

14.     On June 2, 2021, OFAC designated Mr. Bojkov pursuant to E.O. 13818, for allegedly having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of corruption by a foreign person. *Notice of OFAC Sanctions Action*, 86 FED. REG. 30,517 (June 8, 2021); Press Release, U.S. Dep't of the Treasury, *Treasury Sanctions Influential Bulgarian Individuals and Their Expansive Networks for Engaging in Corruption* (June 2, 2021), *available at*: https://home.treasury.gov/news/press-releases/jy0208.

15.     The press release announcing Mr. Bojkov's designation stated that Mr. Bojkov was designated for having allegedly engaged in the following conduct:

- First, the press release alleged that Mr. Bojkov "bribed government officials on several occasions," including "a current political leader and the former Chairman of the now-abolished SCG." *Id.*

- Second, the press release alleged that "Bojkov also planned to provide a sum of money to a former Bulgarian official and a Bulgarian politician earlier this year [(2021)] to help Bojkov create a channel for Russian political leaders to influence Bulgarian government officials." *Id.*

- Third, the press release alleged that "Bojkov is currently in Dubai, United Arab Emirates, where he successfully evaded Bulgarian extradition on a number of charges levied in 2020, including leading an organized crime group, coercion, attempted bribery of an official, and tax evasion." *Id.*

- Fourth, the press release alleged that the "Prosecutor's Office of the Republic of Bulgaria found that in February 2018, Bojkov paid the then-Chair of the SCG 10,000 Bulgarian Lev (approximately $6,220) on a daily basis to revoke Bojkov's competitors' gambling licenses." *Id.* According to the press release, "[f]ollowing this massive bribery scheme, the Chair of the SCG resigned, was arrested, and the SCG was abolished," and "[t]here remains an international warrant for Bojkov's arrest as his influence continues in Bulgaria." *Id.*

- Fifth, and finally, the press release alleged that, "[i]n advance of the July 2021 Bulgarian parliamentary elections, Bojkov registered a political party that will run candidates in the aforementioned elections to target Bulgarian politicians and officials." *Id.*

16.    As a result of his designation, Mr. Bojkov's name was incorporated into the SDN List, and all property in which he had an interest that was or came within the United States was blocked. In addition, U.S. persons were prohibited from engaging in transactions or dealings with him absent an applicable statutory exemption or a license issued by OFAC. Moreover, foreign persons who engaged in certain transactions or dealings with him were themselves exposed to risk of designation under E.O. 13818.

**B.      Mr. Bojkov's March 12, 2022 Petition for Administrative Reconsideration**

17.      OFAC administers regulatory procedures by which persons designated pursuant to its regulations and identified on the SDN List may seek their removal from the SDN List. *See* 31 C.F.R. § 501.807. OFAC's delisting procedures allow interested parties to request reconsideration of their designations by arguing that there is an insufficient basis for the designation; asserting that the circumstances resulting in the designation no longer apply; or proposing remedial measures that they believe would negate the basis of the designation, if adopted. *Id*.

18.      OFAC has also provided guidance for persons seeking delisting. U.S. Dep't of the Treasury, Off. of Foreign Assets Control, *Filing a Petition for Removal from an OFAC List*, *available at*:  https://home.treasury.gov/policy-issues/financial-sanctions/specially-designated-nationals-list-sdn-list/filing-a-petition-for-removal-from-an-ofac-list/ (last accessed Sept. 17, 2025). OFAC's guidance states that "the ultimate goal of sanctions is not to punish, but to bring about a positive change in behavior." *Id*. This guidance also offers examples of situations in which a delisting would be warranted, including "a positive change in behavior" or when "the basis of [a] designation no longer exists." *Id*.

19.      On March 12, 2022, Mr. Bojkov submitted a petition for administrative reconsideration to OFAC seeking the rescission of his designation and the removal of his name from the SDN List ("Petition"). The Petition was submitted to OFAC pursuant to its procedures governing removal from the SDN List and public guidance on seeking such removals.

20.      The Petition argued that (a) an insufficient basis exists for Mr. Bojkov's designation; and (b) the circumstances underlying the designation have changed such that they no longer apply.

21.    In support of Mr. Bojkov's argument that an insufficient basis exists for his designation, the Petition argues that certain factual allegations in the press release announcing Mr. Bojkov's designation are inaccurate, while certain other allegations, even if accurate, would not satisfy the designation criteria set forth in E.O. 13818. The Petition consolidates the five allegations in the press release into three categories—i.e., (i) bribery of government officials; (ii) alleged plan for Russian influence of Bulgarian officials; and (iii) evasion of Bulgarian extradition—and addressed each in turn.

22.    First, the Petition asserted that Mr. Bojkov did not make bribe payments to Bulgarian officials. Rather, any payments that Mr. Bojkov did make were extortion payments, and thus not sanctionable under E.O. 13818.

23.    Second, the Petition asserted that Mr. Bojkov did not plan for Russian influence over Bulgarian officials. Specifically, the Petition denied any plans to pay officials to create a channel for Russian influence. Arguing in the alternative, the Petition asserts that, even if Mr. Bojkov had planned to pay officials to channel Russian influence and had registered a political party—both of which he denies—neither activity was sanctionable, as E.O. 13818 does not render sanctionable making plans or the registration of political parties.

24.    Third, the Petition asserted that Mr. Bojkov did not evade Bulgarian extradition. Specifically, the Petition notes that 1) Mr. Bojkov's Bulgarian arrest warrant was issued after he was already in Dubai; 2) that he attended the extradition proceedings; 3) that a UAE court denied Bulgaria's extradition request for failure to provide necessary documentation; and 4) that Mr. Bojkov had repeatedly attempted to address the Bulgarian criminal proceeding from abroad. Furthermore, the Petition noted that Mr. Bojkov had no need to evade prosecution for tax-related charges, as he and his companies had paid all taxes on time, were regularly audited, and did not

owe any outstanding taxes. Accordingly, the Petition asserts that the allegations that Mr. Bojkov evaded Bulgarian proceedings against him by residing in Dubai are inaccurate.

25.    In support of Mr. Bojkov's argument that circumstances underlying his designation have changed such that his designation is no longer warranted, the Petition asserts that the lottery industry in Bulgaria was nationalized, and that the SCG was abolished. Consequently, Mr. Bojkov's lottery businesses are not operational and there is no cause for him to make payments to the SCG.

### C.    OFAC's June 17, 2022 Questionnaire

26.    On June 17, 2022, OFAC issued a questionnaire seeking clarifying, corroborating, or other additional information relevant to its adjudication of the Petition, to which Mr. Bojkov timely responded on September 15, 2022.

27.    Mr. Bojkov's response to OFAC's June 17, 2022 questionnaire provides detailed responses and extensive documentation responsive to OFAC's inquiries, including thorough responses to questions regarding Mr. Bojkov's alleged payment of bribes.

28.    In addition, Mr. Bojkov's response to OFAC's June 17, 2022 questionnaire provided OFAC with an update on the status of his Bulgarian criminal proceedings.

29.    Further, Mr. Bojkov's response to OFAC's June 17, 2022 questionnaire presented an additional argument in favor of his removal from the SDN List to supplement the two arguments included in the Petition. Specifically, consistent with OFAC's regulatory procedures and guidance on delisting from the SDN List, Mr. Bojkov proposed several remedial measures which, if adopted, would negate the basis for his designation.

**D.    OFAC's January 19, 2023 Designation Administrative Record Disclosure**

30.    On January 19, 2023, in response to Mr. Bojkov's December 18, 2021 request for the administrative record, OFAC disclosed an unclassified, non-privileged version of the administrative record underlying Mr. Bojkov's E.O. 13818 designation.

31.    The disclosed administrative record contained a redacted version of the evidentiary memorandum setting forth OFAC's evidentiary basis and conclusions underlying its determination that Mr. Bojkov satisfied the designation criteria of E.O. 13818, as well as redacted versions of the exhibits to the administrative record.

**E.    Mr. Bojkov's April 2, 2023 Supplement to the Petition**

32.    On April 2, 2023, Mr. Bojkov submitted a supplement to the Petition to OFAC. Mr. Bojkov's April 2, 2023 supplement: (1) asserted two additional arguments for delisting; (2) provided additional information; (3) requested a meeting with OFAC to discuss the Petition; and (4) requested the opportunity to address any foreign policy guidance from the State Department.

33.    First, Mr. Bojkov's April 2, 2023 supplement argued that an insufficient basis exists for designation because OFAC discounted evidence undermining its allegations, including documentation demonstrating that he did not pay bribes.

34.    Second, Mr. Bojkov's April 2, 2023 supplement provided additional information relevant to OFAC's consideration of the Petition, including documentation evidencing that Bulgarian tax evasion proceedings initiated against him are unfounded.

35.    Third, Mr. Bojkov's April 2, 2023 supplement requested a meeting with OFAC to discuss the Petition.

36.    Fourth, Mr. Bojkov's April 2, 2023 supplement requested the opportunity to address any foreign policy guidance that OFAC may receive from the State Department before OFAC adjudicates the Petition, so that Mr. Bojkov can rebut any allegations made in the guidance.

**F.    OFAC's July 6, 2023 Meeting with Undersigned Counsel**

37.    On June 14, 2023, in response to the meeting request in Mr. Bojkov's April 2, 2023 supplement, OFAC contacted undersigned counsel requesting a preliminary meeting to discuss what would be addressed in any potential meeting with Mr. Bojkov.

38.    On July 6, 2023, undersigned counsel met with OFAC. During the July 6, 2023 meeting, OFAC expressed interest in meeting with Mr. Bojkov and discussed, *inter alia*, terms for inclusion in any Terms of Removal Agreement ("TOR").

39.    Following the July 6, 2023 meeting, OFAC did not seek a meeting with Mr. Bojkov.

**G.    Mr. Bojkov's October 10, 2023 Supplement to the Petition**

40.    On October 10, 2023, Mr. Bojkov submitted a supplement to the Petition to OFAC that: (1) asserted two additional arguments for delisting; and (2) provided additional information relevant to OFAC's consideration of the Petition.

41.    First, the additional arguments for delisting included in Mr. Bojkov's October 10, 2023 supplement were that the circumstances underlying his designation have changed because he surrendered to Bulgarian authorities—addressing OFAC's allegations that he was evading prosecution—and a proposal for an additional remedial measure that would further negate the basis for his designation.

42.    Second, Mr. Bojkov's October 10, 2023 supplement provided additional information relevant to OFAC's consideration of the Petition, including documentation of the

dismissal of certain criminal charges against him for lack of evidence, and updated documentation evidencing that he does not owe taxes that could form the basis for purported tax evasion.

### H.     OFAC's November 21, 2023 Questionnaire

43.     On November 21, 2023, OFAC issued a questionnaire seeking clarifying, corroborating, or additional information relevant to its review of the Petition, to which Mr. Bojkov timely responded on February 19, 2024.

44.     Mr. Bojkov's response to OFAC's November 21, 2023 questionnaire provided detailed responses and documentation responsive to OFAC's inquiries, including thorough responses to questions regarding the dismissal of Bulgarian criminal charges against him.

45.     In addition to responses to OFAC's questions, Mr. Bojkov's response to OFAC's November 21, 2023 questionnaire provided information countering false public reporting that he remains involved in the gambling industry.

### I.     Mr. Bojkov's June 15, 2024 Supplement to the Petition

46.     On June 15, 2024, Mr. Bojkov submitted a supplement to the Petition to OFAC, presenting an additional argument for delisting.

47.     Specifically, Mr. Bojkov's June 15, 2024 supplement proposed several remedial measures which, alongside the remedial measures he previously proposed, which would further negate the basis for his designation, if adopted.

### J.     OFAC's July 1, 2024 Questionnaire

48.     On July 1, 2024, OFAC issued a questionnaire seeking clarifying, corroborating, or other additional information relevant to its consideration of the Petition, to which Mr. Bojkov timely responded on August 15, 2024.

49. Mr. Bojkov's response to OFAC's July 1, 2024 questionnaire provides detailed responses and documentation responsive to OFAC's inquiries, including thorough responses to questions regarding Mr. Bojkov's activities since his designation.

50. In addition to responses to OFAC's questions, Mr. Bojkov's response to OFAC's July 1, 2024 questionnaire provides certain additional information relevant to OFAC's consideration of the Petition.

51. Specifically, Mr. Bojkov's response to OFAC's July 1, 2024 questionnaire discloses the evidence that Bulgarian prosecutors purportedly had against him, and notes that the evidence primarily consists of testimony given in 2020 by witnesses who are unreliable due to their own alleged participation in corrupt activities.

52. OFAC confirmed receipt of Mr. Bojkov's August 15, 2024 response to OFAC's July 1, 2024 questionnaire on August 15, 2024.

**K.     OFAC's Delayed Adjudication**

53. On November 14, 2024, approximately three months after Mr. Bojkov responded to OFAC's July 1, 2024 questionnaire, undersigned counsel sought a status update regarding OFAC's adjudication of the Petition.

54. On December 12, 2024, approximately four months after Mr. Bojkov responded to OFAC's July 1, 2024 questionnaire, OFAC responded to undersigned counsel's November 14, 2024 correspondence, stating that OFAC was working to adjudicate the Petition in the coming months.

55. On July 8, 2025, undersigned counsel again raised, *inter alia*, Mr. Bojkov's case to OFAC noting the delays in adjudication. In response, OFAC scheduled a conference call with undersigned counsel to discuss the status of Mr. Bojkov's case as well as others. During that

conference call OFAC informed undersigned counsel that Mr. Bojkov's case would be adjudicated within a matter of weeks.

**L.      Instant Litigation and Denial Determination**

56.      On October 8, 2025, Mr. Bojkov initiated the instant litigation alleging unreasonable delay in the processing of the Petition and disparate treatment compared to similarly situated persons in such processing, both in violation of the APA. *See* Complaint at 15-16, *Bojkov v. Smith*, No. 25-cv-03617 (D.D.C. Oct. 8, 2025).

57.      In response, on December 5, 2025, OFAC adjudicated the Petition by issuing a final agency action denying Mr. Bojkov's delisting request and issuing a letter notifying Mr. Bojkov of the reasons for his denial ("Denial Letter").

58.      First, the Denial Letter concludes that even if Mr. Bojkov "did not bribe any Bulgarian officials, but rather, was extorted by Bulgarian government officials to pay them," he nevertheless engaged sanctionable conduct. In support of this conclusion, OFAC found that Mr. Bojkov "did in fact make payments to Bulgarian government officials in exchange for preferential treatment of his businesses that substantially enriched" him, and "does not refute having made these payments."

59.      The Denial Letter does not explain why Mr. Bojkov's alleged receipt of preferential treatment and enrichment following his extortion payments warranted OFAC's dismissal of the distinction between coerced extortion payments and voluntary bribery payments. Nor does the Denial Letter address the fact that victims of extortion could receive benefits from acquiescing to the demands of extorters.

60.      Indeed, Defendants' denial tacitly accepts that Mr. Bojkov's alleged "bribe" payments in connection with his prior business, may have instead been "extortion" payments, but

maintained that such payments were still sanctionable because Mr. Bojkov benefitted from them. In concluding so, Defendants do not analyze the differences between bribes and extortion payments, and do not provide any explanation why persons who are extorted meet the definition of involvement in corruption.

61.     Second, the Denial Letter concluded that Mr. Bojkov's asserted "change in circumstances given the abolishment of the SCG and the alleged severance of ties with Boyko Borisov, Vladislav Goranov, and the Bulgarian government…do[es] not demonstrate a change in circumstances of [his] designation pursuant to E.O. 13818 sufficient to warrant" delisting. In support of its second conclusion, OFAC found that "[i]nformation available to OFAC indicates that [Mr. Bojkov] remains under investigation in Bulgaria for various alleged criminal activities, including those that involve the same activities that formed the basis for [his] designation." As an additional finding in support of this conclusion, OFAC found that "information available to OFAC indicates that, after the date of the imposition of sanctions, [Mr. Bojkov] engaged in sanctionable activity similar to that which led to his designation."

62.     The Denial Letter does not identify what changes in circumstances would be sufficient to warrant delisting; nor does it explain why the abolishment of the SCG—the instrumentality of the alleged corruption—and severance of ties with Bulgarian officials do not constitute sufficient changes in circumstances. Indeed, the Denial Letter offers no analysis of the implications of the SCG's abolishment, despite its identification in the press release announcing Mr. Bojkov's designation as a central vehicle for the corrupt activity for which he was designated.

63.     The Denial Letter does not explain why the existence of Bulgarian investigations undermine Mr. Bojkov's asserted changed circumstances. Further, the Denial Letter does not evidence OFAC's consideration of the reliability of the allegations underlying the Bulgarian

15

investigation; does not address that investigation's lack of finality; and does not otherwise evidence OFAC's consideration of the permissibility and merits of establishing comity with a foreign investigation.

64.     Indeed, based on the Denial Letter, OFAC delegated its fact-finding responsibility to foreign investigators operating under foreign legal standards without analyzing the qualifications of those investigators or the credibility of the evidence underlying that investigation, and without regard to the fact that the foreign investigators themselves have yet to reach conclusions on the allegations.

65.     With respect to OFAC's second finding underlying its second conclusion, the Denial Letter does not explain why the post-designation conduct undermines Mr. Bojkov's asserted changes in circumstances, and does not provide any dates, descriptions, or other facts regarding Mr. Bojkov's allegedly sanctionable post-designation conduct.

66.     Third, the Denial Letter evidences OFAC's conclusion that Mr. Bojkov's proposed remedial measures are insufficient. In support of this conclusion, OFAC found that the proposed remedial measures "would not sufficiently demonstrate that the type of conduct forming the basis of his designation has ceased and…would [not] demonstrate changes in circumstances that ensure such conduct will not occur again. For example, the proposed remedial steps do not adequately address the past conduct for which [Mr. Bojkov] was designated or similar activities for which [Mr. Bojkov] remains under criminal investigation in Bulgaria." As an additional finding in support of its third conclusion, OFAC found that "the proposed remedial steps would not prevent [Mr. Bojkov] from, in the future, engaging in the sanctionable activity that led to his designation."

67.     The Denial Letter contains no explanation of what remedial measures would be sufficient to negate the basis of the designation.

16

68.     Furthermore, with respect to Defendants first finding in support of the third conclusion, the Denial Letter does not explain why the proposed remedial measures must address the cessation and prevention of the "type of conduct forming the basis for the designation" rather than the specific conduct underlying the designation. Indeed, the Denial Letter does not state what "type of conduct" Defendants are referring to.

69.     Additionally, with respect to Defendants second finding in support of the third conclusion, the Denial Letter does not explain why the proposed remedial measures do not prevent the activity that led to Mr. Bojkov's designation; nor does it explain why prevention is necessary to negate the basis for designation.

**M.     OFAC's April 2, 2026 Denial Administrative Record Disclosure**

70.     On April 2, 2026, Defendants disclosed an unclassified, non-privileged version of the administrative record underlying its decision to deny Mr. Bojkov's petition for administrative reconsideration ("denial administrative record").

71.     The denial administrative record contained a redacted version of the evidentiary memorandum setting forth Defendants' evidentiary basis and conclusions underlying its determination to deny Mr. Bojkov's petition for administrative reconsideration.

72.     In the basis for denial section of the denial administrative record, Defendants rejected Mr. Bojkov's argument that there was an insufficient basis for his designation because (1) Mr. Bojkov did not refute making payments to Bulgarian officials in exchange for preferential treatment of his business; and (2) Mr. Bojkov acknowledged he made payments to the former Chairman of the SCG to revoke his competitors' gambling licenses. Defendants concluded that Mr. Bojkov was a participant in the bribery scheme and enjoyed significant profits from it. *See* Admin. R. ("AR") at 152-153.

17

73. The denial administrative record, however, does not distinguish the alleged payments as either a bribe or made as a result of extortion. Instead, Defendants' reasoning merely relies on the payments being made, and does not consider that Mr. Bojkov could have received benefits from the payments, but that those payments were nonetheless made under duress. *See* AR at 152.

74. With respect to Mr. Bojkov's arguments that there was a change in circumstances, Defendants denied that any such change had occurred, despite the nationalization of the lottery business in Bulgaria, the abolition of the SCG, the defunct status of Mr. Bojkov's lottery companies, and Mr. Bojkov's severing ties with Borisov, Goranov, and the Bulgarian government.

75. Defendants reasoned that Mr. Bojkov was designated under criteria broader than simply making payments to the Chairman of the SCG, and that he continues to benefit from the proceeds of corruption. *See* AR at 154-155. Further, Defendants concluded that because Mr. Bojkov had proposed to close his remaining gambling business in response to a questionnaire, Defendants interpreted this as evidence that he continued to operate in the gambling industry post-designation. AR at 155.

76. The denial administrative record does not explain why the abolishment of the SCG, which, as noted, is the central vehicle for the corrupt activity for which he was designated, and the severance of ties with Bulgarian officials, do not constitute sufficient changes in circumstances. Mr. Bojkov addressed the allegations made against him and presented these changes in circumstances, but Defendants rejected his arguments without providing any additional reasoning as to what changes in circumstances would be sufficient to warrant his delisting.

77. Moreover, the denial administrative record notes that Mr. Bojkov continues to benefit from the proceeds of corruption and has not paid any form of restitution. *Id*. However,

Defendants do not point to any specific dealings in which Mr. Bojkov continues to benefit. Further, Defendants do not identify to whom he should make restitution and in what amounts; that Defendants ever requested that he make restitution; nor that they ever asked Mr. Bojkov whether he intended to or would be willing to make restitution.

78.    Moreover, Defendants reasoned that although Mr. Bojkov stated he is not involved in the lottery business in countries other than Bulgaria, he "has not provided any evidence that he has not had any lottery businesses or related dealings in those countries." *Id*. It is unclear what evidence Mr. Bojkov must produce to show he is not doing something, and Defendants do not identify means by which Mr. Bojkov could prove the negative.

79.    Instead, Defendants' conclusion that Mr. Bojkov continued to operate in the gambling sector post-designation relies on its interpretation of Mr. Bojkov's proposed remedial measure to close all gambling businesses to assure OFAC that he has exited the industry. *Id*. The denial administrative record, however, does not identify any conduct by Mr. Bojkov post-designation, but rather cites the status of previous businesses as evidence of ongoing conduct.

80.    Regarding Mr. Bojkov's proposed remedial measures, Defendants concluded that they are insufficient to negate Mr. Bojkov's basis for designation or to lead to a change in circumstances that would warrant Mr. Bojkov's removal from the SDN List. Defendants reasoned that because Mr. Bojkov launched a new political party and accused politicians of corruption, this undermines the utility of Mr. Bojkov's proposed remedial measure of issuing a public statement promoting anti-corruption reform in the country. AR at 156.

81.    Additionally, Defendants explained that the Government of the United Kingdom determined, following Mr. Bojkov's designation, that he had engaged in serious corruption by offering a bribe to a Bulgarian public official. AR at 157. Thus, Defendants concluded that the

19

proposed remedial measures do not provide assurances that Mr. Bojkov is no longer engaged in sanctionable conduct. AR at 156. Defendants also explained that the proposed remedial measures do not adequately address the past sanctionable conduct Mr. Bojkov engaged in. *Id*.

82. The denial administrative record does not explain why the "utility" of Mr. Bojkov's remedial measures is undermined by his public accusations of corruption against politicians. Moreover, Defendants cite the Government of the United Kingdom's determination that Mr. Bojkov allegedly engaged in corruption by paying a bribe to a Bulgarian official after his designation to support the notion that Mr. Bojkov has not "moved past the businesses and activities forming the basis of his designation." AR at 156. Defendants do not, however, assess the reliability of the UK Government's action or the evidentiary requirements necessary to take it, and instead rely solely on its conclusion to support Defendants' own conclusion that Mr. Bojkov continues to engage in sanctionable activity.

83. The denial administrative record does not explain why Mr. Bojkov's remedial measures do not adequately address the past conduct for which Mr. Bojkov was designated or why they do not provide assurances to Defendant OFAC that Mr. Bojkov will not engage in sanctionable conduct in the future. Further, the denial administrative record contains no explanation of what remedial measures would be sufficient to negate the basis of the designation.

**N.    Harm Suffered by Mr. Bojkov**

84. Defendant OFAC's designation of Mr. Bojkov—and Defendants' denial of the Petition—has caused substantial harm to Mr. Bojkov personally, professionally, and financially, tarnishing his reputation and upending his ability to conduct basic transactions to support his livelihood.

85.     Specifically, Defendant OFAC's allegation that Mr. Bojkov has bribed Bulgarian officials resulted in the loss of commercial partnerships and business relationships. Further, the fact that Mr. Bojkov's name remains on the SDN List has barred Mr. Bojkov from accessing services offered by persons subject to U.S. jurisdiction, including financial institutions.

86.     Mr. Bojkov has faced, and continues to face, extensive difficulties to his commercial and financial interests, as banks, suppliers, and customers refrain from engaging in transactions with Mr. Bojkov out of fear of their own sanctions exposure.

87.     Mr. Bojkov's ongoing suffering is a direct result of his continued designation under E.O. 13818.

## CAUSE OF ACTION

### COUNT I

### DEFENDANTS' DENIAL OF MR. BOJKOV'S PETITION FOR ADMINISTRATIVE RECONSIDERATION CONSTITUTES ARBITRARY AND CAPRICIOUS ACTION UNDER THE ADMINISTRATIVE PROCEDURE ACT

88.     Mr. Bojkov re-alleges and incorporates by reference as if fully set forth herein the allegations in all preceding paragraphs.

89.     The APA requires agencies to "articulate a satisfactory explanation for [their] action, including a 'rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*. This means that an agency must examine "the relevant data" and cannot rely on conclusory statements. *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014).

21

90.     Defendants arbitrarily and capriciously failed to articulate a satisfactory explanation and to consider important aspects of the problem in concluding that Mr. Bojkov's alleged payments to Bulgarian officials constituted sanctionable conduct regardless of whether they were extortion payments or bribes due to his alleged receipt of preferential treatment and enrichment. Specifically, OFAC failed to articulate a satisfactory explanation because it did not explain why the alleged receipt of preferential treatment and enrichment justified the dismissal of the distinction between extortion and bribery payments. Instead, OFAC concludes that because the payments caused the officials to act in Mr. Bojkov's business interests, this negates his argument that there is an insufficient basis for his designation. Moreover, OFAC failed to consider important aspects of the problem because it did not consider the coerced nature of extortion payments or the possibility that victims of corruption could receive some benefit from acquiescing to the demands of the perpetrators of corruption.

91.     Courts have explained that extortion and bribery are distinct, stating, "while the essence of bribery is voluntariness, the essence of extortion is duress." *United States v. Addonizio*, 451 F.2d 49, 72 (3d Cir. 1971). Defendant OFAC's determination that an official's favorable action toward a payor necessarily transforms a coerced payment into a bribe is irreconcilable with this controlling legal distinction. The critical inquiry remains whether the payor acted voluntarily or under duress, a question Defendants failed entirely to address.

92.     In support of its conclusion, Defendant OFAC relied on Mr. Bojkov's reported status as "Bulgaria's richest man" with significant influence. AR at 152. However, wealth does not negate coercion. Instead, it may explain precisely why powerful officials targeted Mr. Bojkov, as he had assets worth extracting. Defendant OFAC also pointed to Mr. Bojkov's payments to the Chairman of the SCG to revoke competitors' licenses as evidence of a "pattern of practice"

22

inconsistent with extortion. AR at 153. But Defendant OFAC failed to explain why evidence relating to a separate, discrete transaction involving a different official, a different purpose, and different circumstances negates Mr. Bojkov's documented account of coercion by Prime Minister Borisov and Finance Minister Goranov.

93.     Defendants arbitrarily and capriciously failed to articulate a satisfactory explanation in concluding that the abolishment of the SCG, the nationalization of the Bulgarian lottery industry, the insolvency of Mr. Bojkov's lottery businesses, and the severance of ties with Bulgarian officials did not constitute sufficient changed circumstances. Defendants reasoned Mr. Bojkov's assertions that he can no longer pay extortion payments to the Chairman of the SCG are "not dispositive of a change in circumstances" because Mr. Bojkov was designated under E.O. 13818 for having "materially assisted, sponsored, or provided financial, material, or technological support for, or goods to or in support of corruption, including the misappropriation of state assets, the expropriation of private assets for personal gain, corruption relate to government contracts or the extraction of natural resources, or bribery that is conducted by a foreign person." AR at 155. Defendants, however, failed to identify any continuing conduct by Mr. Bojkov that satisfies the broader designation criteria, notwithstanding the abolishment of the very state instrumentality through which the alleged corruption occurred and his severance of ties with the Bulgarian officials at the center of the alleged scheme.

94.     Additionally, Defendants' rationale that Mr. Bojkov may still benefit from proceeds of corruption earned prior to designation is impermissibly speculative and conclusory. *See* AR at 155. Specifically, Defendants identify no specific asset, transaction, or financial benefit that Mr. Bojkov allegedly continues to benefit from. Instead, Defendants assert the theoretical possibility that he retains funds earned years ago. That reasoning, if accepted, would render the "change in

23

circumstances" pathway for delisting under 31 C.F.R. § 501.807 a nullity, as no designated person could ever demonstrate changed circumstances so long as OFAC could speculate that he retains any wealth accumulated prior to designation. Defendants were required to examine the specific evidence Mr. Bojkov submitted, including documentation of his exit from the lottery industry, the insolvency of his former businesses, and the abolition of the SCG, and to explain why that evidence was insufficient.

95.    Defendants arbitrarily and capriciously failed to articulate a satisfactory explanation and failed to consider important aspects of the problem in concluding that Mr. Bojkov had not demonstrated sufficient change in circumstances based on their finding that Mr. Bojkov is under investigation in Bulgaria. Specifically, Defendants failed to articulate a satisfactory explanation because it did not explain why ongoing Bulgarian investigations undermine the changes in circumstances that Mr. Bojkov asserted. Moreover, Defendants failed to consider important aspects of the problem by failing to address the reliability of the allegations and evidence underlying the Bulgarian investigation; the investigation's lack of finality; and whether establishing comity with a foreign investigation is permissible and meritorious.

96.    Defendants arbitrarily and capriciously failed to articulate a satisfactory explanation in concluding that Mr. Bojkov had not demonstrated sufficient change in circumstances based on its finding that he engaged in sanctionable post-designation conduct. Specifically, Defendants failed to articulate a satisfactory explanation because it did not explain why the allegedly sanctionable post-designation conduct undermines Mr. Bojkov's asserted change in circumstances and did not provide sufficient details regarding the alleged conduct. Indeed, OFAC's determination in this regard is completely conclusory.

97.     Defendants cited the United Kingdom's February 10, 2023 sanctions designation as corroborating evidence but failed to explain why a separate foreign government's sanction decision constitutes independent evidence of sanctionable conduct rather than circular reinforcement of the original designation. *See* AR at 157. Additionally, Defendants cited reports of post-designation gambling operations in Moldova and Georgia, but acknowledged that Mr. Bojkov disputed those reports and failed to explain why unverified media reports constitute sufficient evidence to negate documented changed circumstances. *See* AR at 155. In each instance, Defendants substituted a conclusory assertion for a reasoned explanation, in direct violation of the APA's requirement that agencies examine "the relevant data" and provide a rational connection between the facts found and the conclusions drawn. Defendants arbitrarily and capriciously failed to articulate a satisfactory explanation in concluding that Mr. Bojkov's proposed remedial measures would not negate the basis for designation by failing to explain what measures would be sufficient to negate the basis of the designation.

98.     Defendants also cited Mr. Bojkov's formation of a new political party and his public accusations against other politicians as evidence that his proposed remedial measure to publish an anti-corruption statement was insincere. AR at 156. But Defendants failed to explain why participating in political opposition and accusing others of corruption—conduct entirely consistent with Mr. Bojkov's long-standing position that he was a victim of official extortion—constitutes bad faith under the operative compliance terms of the proposed remedial measures.

99.     Defendants arbitrarily and capriciously failed to articulate a satisfactory explanation in concluding that Mr. Bojkov's proposed remedial measures would not negate the basis for designation based on its finding that the measures would not demonstrate the cessation and prevention of the "type of activity" underlying the designation. Specifically, Defendants failed

25

to articulate a satisfactory explanation because it did not explain why the proposed remedial measures needed to address the "type of activity" underlying the designation rather than the specific activity underlying the designation. Moreover, OFAC failed to articulate a satisfactory explanation because it did not explain what "type of activity" it was referring to. Indeed, Defendants' determination in this regard was completely conclusory.

100.    Defendant arbitrarily and capriciously failed to articulate a satisfactory explanation in concluding that Mr. Bojkov's proposed remedial measures would not negate the basis for the designation based on its finding that the measures would not prevent the activity that led to Mr. Bojkov's designation. Specifically, OFAC failed to articulate a satisfactory explanation because it did not explain why the proposed remedial measures would not prevent the activity underlying the designation, and did not explain why prevention is necessary to negate the basis for designation.

101.    Defendants' denial of the Petition constitutes arbitrary and capricious agency action under the APA. Mr. Bojkov will continue to suffer the consequences of his designation so long as OFAC persists in leveraging arbitrary and capricious reasoning, standards, and explanations in maintaining Mr. Bojkov's sanctions designation.

## **RELIEF REQUESTED**

WHEREFORE, Mr. Bojkov respectfully requests that this Court:

A.    Issue an order vacating OFAC's denial of the Petition;

B.    Issue an order remanding consideration of the Petition to OFAC with instructions for OFAC to promptly adjudicate the Petition without leveraging arbitrary and capricious reasoning, standards, and explanations;

C.      Grant an award to Mr. Bojkov of his costs and attorneys' fees under the Equal

Access to Justice Act, 28 U.S.C. § 2412 *et* seq., and any other applicable provision

of law; and

D.      Grant such other and further relief as the Court may deem just and proper.

Dated: May 11, 2026

Respectfully submitted,

/s/ Erich C. Ferrari
Erich C. Ferrari, Esq.
Ferrari & Associates
1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004
Telephone: (202) 280-6370
Fax: (877) 448-4885
Email: ferrari@falawpc.com
D.C. Bar No. 978253

*Attorney for Plaintiff*