**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **VASSIL BOJKOV,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:25-cv-03617-PLF |
| v. | ) | |
| | ) | |
| **BRADLEY T. SMITH,** | ) | |
| Department of the Treasury, | ) | |
| Director, Office of Foreign Assets Control, | ) | |
| *et. al.,* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN
THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

STEPHEN M. ELLIOTT
Assistant Director
Federal Programs Branch

JACQUELINE C. LAU
(DC Bar No. 90024952)
Trial Attorney
U.S. Department of Justice, Civil Division
Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
(202) 598-0914
Jacqueline.C.Lau@usdoj.gov

*Counsel for Defendants*

i

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

    I.      Legal Background................................................................................................. 2

          a.     International Emergency Economic Powers Act ....................................... 2

          b.     The Global Magnitsky Human Rights Accountability Act........................ 4

          c.     Blocking the Property of Persons Pursuant to Executive
                 Order 13818 ............................................................................................. 5

    II.     Factual Background ............................................................................................. 7

          a.     OFAC's Designation of Plaintiff Pursuant to Executive
                 Order 13818 ............................................................................................. 7

          d.     Plaintiff's Petition for Administrative Reconsideration ........................... 8

    III.    Procedural History ............................................................................................. 9

LEGAL STANDARD......................................................................................................... 11

ARGUMENT ...................................................................................................................... 12

    I.      OFAC's Decision to Deny Plaintiff's Petition for Administrative
         Reconsideration Was Not Arbitrary and Capricious ......................................... 12

          a.     OFAC's Decision Is Entitled to a Heightened Deferential Standard
                 Because This Case Involves National Security and Foreign Affairs........ 12

          b.     OFAC's Denial of Plaintiff's Petition for Administrative
                 Reconsideration is Based on Credible, Substantial Evidence in
                 Accordance with the APA (Count I).......................................................... 14

CONCLUSION.................................................................................................................... 19

## TABLE OF AUTHORITIES

**CASES**

*Airmotive Eng'g Corp. v. FAA*,
   882 F.3d 1157 (D.C. Cir. 2018) ........................................................................................ 18

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................................................... 11

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................................... 11

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ........................................................................................................... 13

*City of Huntington v. U.S. Dep't of Hous. & Urb. Dev.*,
   466 F. Supp. 3d 30 (D.D.C. 2020) ..................................................................................... 13

*Conant v. Wells Fargo*,
   60 F. Supp. 3d 99 (D.D.C. 2014) ....................................................................................... 12

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981) ............................................................................................................. 3

*Diegelmann v. Yellen*,
   No. CV 24-1090 (JEB), 2024 WL 4880468 (D.D.C. Nov. 25, 2024) ................................ 14

*Epsilon Elecs., Inc. v. U.S. Dep't of the Treasury, OFAC*,
   857 F.3d 913 (D.C. Cir. 2017) ........................................................................................... 13

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985) ........................................................................................................... 12

*Grant v. Ent. Cruises, Inc.*,
   282 F. Supp. 3d 114 (D.D.C. 2017) ................................................................................... 11

*Holder v. Humanitarian L. Project*,
   561 U.S. 1 (2010) ............................................................................................................... 14

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
   219 F. Supp. 2d 57 (D.D.C. 2002) ............................................................................... 14, 18

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
   333 F.3d 156 (D.C. Cir. 2003) ........................................................................................... 17

ii

*Islamic Am. Relief Agency v. Gonzales*,
   477 F.3d 728 (D.C. Cir. 2007) ...................................................................... 13, 14

*Kadi v. Geithner*,
   42 F. Supp. 3d 1 (D.D.C. 2012) ...................................................................... 12

*Karadzic v. Gacki*,
   602 F. Supp. 3d 103 (D.D.C. 2022) ............................................................... 14, 17

*Lopez Bello v. Smith*,
   651 F. Supp. 3d 20 (D.D.C. 2022), *aff'd sub nom. Bello v. Gacki*,
   94 F.4th 1067 (D.C. Cir. 2024) ..................................................................... 13

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .......................................................................... 13, 15, 18

*Olenga v. Gacki*,
   507 F. Supp. 3d 260 (D.D.C. 2020) ............................................................... 14

*Orvis v. Brownell*,
   345 U.S. 183 (1953) ...................................................................................... 3

*Propper v. Clark*,
   337 U.S. 472 (1949) ...................................................................................... 3

*Regan v. Wald*,
   468 U.S. 222 (1984) ...................................................................................... 3

*Search v. Uber Techs., Inc.*,
   128 F. Supp. 3d 222 (D.D.C. 2015) ............................................................... 11

*Sparrow v. United Air Lines, Inc.*,
   216 F.3d 1111 (D.C. Cir. 2000) ...................................................................... 11

*Strait Shipbrokers Pte. Ltd. v. Blinken*,
   560 F. Supp. 3d 81 (D.D.C. 2021) ................................................................. 14

*W. Org. of Res. Councils v. Zinke*,
   892 F.3d 1234 (D.C. Cir. 2018) ...................................................................... 11

*Yates v. Dist. of Columbia*,
   324 F.3d 724 (D.C. Cir. 2003) ........................................................................ 11

*Zevallos v. Obama*,
   10 F. Supp. 3d 111 (D.D.C. 2014) ............................................................ 12, 14, 17

iii

*Zevallos v. Obama,*
  793 F.3d 106 (D.C. Cir. 2015) ....................................................................... 12, 19

**STATUTES**

5 U.S.C. § 706(2)(A) ..................................................................................................... 12

22 U.S.C. § 10101 ........................................................................................................... 1

22 U.S.C. § 10102(a)(3) .................................................................................................. 5

50 U.S.C. § 1701(a) ........................................................................................................ 3

50 U.S.C. § 1702 ................................................................................................... 3, 4, 19

50 U.S.C. § 4305(b)(1)(B) .............................................................................................. 3

50 U.S.C. §§ 1701-1706 ................................................................................................. 1

50 U.S.C. §§ 4301-4341 ................................................................................................. 3

Pub. L. No. 65-91, 40 Stat. 411 (1917) .......................................................................... 3

Pub. L. No. 107-56, 115 Stat. 272 (2001) ...................................................................... 4

**RULES**

Fed. R. Civ. P. 12 ..................................................................................................... 11, 12

Fed. R. Civ. P. 56 .......................................................................................................... 12

**LEGISLATIVE MATERIALS**

S. Rep. No. 95-466 (1977), *as reprinted in* 1977 U.S.C.C.A.N. 4540 .......................... 3

**ADMINISTRATIVE MATERIALS**

31 C.F.R. § 501.807 ............................................................................................... 6, 7, 10

31 C.F.R. § 583.802 ........................................................................................................ 6

Blocking Assets and Prohibiting Transactions with Significant Narcotics Traffickers, Exec.
  Order No. 12978,
  60 Fed. Reg. 54,579 (Oct. 21, 1995) ........................................................................... 4

iv

Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to
   Commit, or Support Terrorism, Exec. Order No. 13224,
   66 Fed. Reg. 49,079 (Sept. 23, 2001) ...................................................................................... 4

Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters,
   Exec. Order No. 13382,
   70 Fed. Reg. 38,567 (June 28, 2005) ...................................................................................... 4

Blocking the Property of Persons Involved in Serious Human Rights Abuse or Corruption,
   Exec. Order No. 13818,
   82 Fed. Reg. 60,839 (Dec. 26, 2017) ............................................................................... 1, 5, 6

## OTHER AUTHORITIES

U.S. Dep't of Treasury, Press Release, *Treasury Sanctions Influential Bulgarian
   Individuals and Their Expansive Networks for Engaging in Corruption* (June 2, 2021),
   https://home.treasury.gov/news/press-releases/jy0208 ................................................................ 7

**INTRODUCTION**

The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, confers on the President certain authorities upon the declaration of a national emergency— including the imposition of economic sanctions—to address threats to the national security, foreign policy, and economy of the United States. Invoking this authority, as well as the Global Magnitsky Human Rights Accountability Act, 22 U.S.C. § 10101, *et seq*., and other authorities, the President issued Executive Order No. 13818 ("E.O. 13818" or "Executive Order"), "Blocking the Property of Persons Involved in Serious Human Rights Abuse or Corruption." 82 Fed. Reg. 60839 (Dec. 26, 2017). E.O. 13818 permits economic sanctions against, *inter alia*¸ "any foreign person determined by the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General . . . to be a current or former government official, or a person acting for or on behalf of such an official, who is responsible for or complicit in, or has directly or indirectly engaged in" several enumerated acts of corruption. *Id.*

Pursuant to E.O. 13818, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated Plaintiff Vassil Kroumov Bojkov ("Plaintiff" or "Bojkov") for being a person who has materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of corruption, including the misappropriation of state assets, the expropriation of private assets for personal gain, corruption related to government contracts or the extraction of natural resources, or bribery. OFAC added Plaintiff to the Specially Designated Nationals and Blocked Persons List ("SDN List").

The administrative record demonstrates the propriety of OFAC's decision to designate Plaintiff, who (1) bribed government officials; (2) planned to provide a sum of money to a former Bulgarian official to help create a channel for Russian political leaders to influence Bulgarian

1

government officials; (3) evaded Bulgarian extradition on charges including leading an organized crime group, coercion, attempted bribery of an official, and tax evasion; and (4) paid the former chairman of the now-abolished State Commission on Gambling ("SCG") the equivalent of thousands of U.S. dollars a day to revoke competitors' gambling licenses. Substantial evidence supports OFAC's designation of Plaintiff.

Plaintiff petitioned for administrative reconsideration of his designation and removal from the SDN List. OFAC denied Plaintiff's petition. Now, bringing suit, Plaintiff puts forward only one claim, arguing that OFAC's denial of his petition for reconsideration was arbitrary and capricious under the Administrative Procedure Act ("APA"). However, the administrative record reflects that OFAC carefully reviewed all available information, explained its reasoning in the denial letter to Plaintiff, and reached a decision thoroughly supported by both the unclassified and classified administrative records.[1] Pursuant to the heightened deferential standard under the APA, OFAC's decisionmaking easily surpasses the requisite standard and forecloses Plaintiff's sole claim.

Accordingly, and for the reasons discussed more fully below, the Court should grant the government's motion to dismiss or, in the alternative, motion for summary judgment.

**BACKGROUND**

## I.    Legal Background

### a.    International Emergency Economic Powers Act

For nearly its entire history, the United States has employed economic sanctions as a means to protect national security and achieve foreign policy goals. During much of the twentieth century,

---

[1] As noted in the Argument section of this motion, see *infra* Part I(b), Defendants will lodge with the Court the classified administrative record, solely for the Court's consideration *in camera* and *ex parte*, once briefing has concluded.

2

U.S. sanctions programs were governed by the Trading with the Enemy Act ("TWEA"), enacted in 1917. *See* Pub. L. No. 65-91, 40 Stat. 411, 411-16 (1917) (codified as amended at 50 U.S.C. §§ 4301-4341). As amended in 1933, TWEA granted the President "broad authority," *Dames & Moore v. Regan*, 453 U.S. 654, 670-72 (1981), to "investigate, regulate . . . prevent or prohibit . . . transactions" in times of war or declare national emergencies. 50 U.S.C. § 4305(b)(1)(B). Although TWEA does not use the term "block," the authority it conveys to the Executive Branch to regulate, prevent, or prohibit transactions has been consistently interpreted to encompass the power to block or freeze an entity's property. *See, e.g.*, *Orvis v. Brownell*, 345 U.S. 183, 186-88 (1953); *Propper v. Clark*, 337 U.S. 472, 483-84 (1949). In 1977, Congress amended TWEA and enacted the IEEPA. *See* S. Rep. No. 95-466, at 1-2 (1977), *as reprinted in* 1977 U.S.C.C.A.N. 4540, 4541. IEEPA limited TWEA's application to periods of declared wars, but it also extended the President's authority to declare national emergencies. *See Regan v. Wald*, 468 U.S. 222, 227-28 (1984). Although the broad authorities granted to the President under IEEPA remain essentially the same as those under TWEA, with certain limited exceptions, *see id.* at 228, IEEPA authorizes the President to declare a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States," 50 U.S.C. § 1701(a). Once such a national emergency is declared, IEEPA authorizes the President to:

> [R]egulate, direct and compel, nullify, void, prevent or prohibit, any . . . transfer . . . of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest . . . with respect to any property, subject to the jurisdiction of the United States . . . .

*Id.* § 1702(a)(1)(B).

Pursuant to this expansive authority, and in response to a variety of declared national emergencies, presidents have imposed sanctions with respect to many countries—including Iran,

3

Burma, and North Korea—as well as on individuals, such as narcotics traffickers, proliferators of weapons of mass destruction, and terrorists and their supporters. *See, e.g.*, Blocking Assets and Prohibiting Transactions with Significant Narcotics Traffickers, Exec. Order No. 12978, 60 Fed. Reg. 54,579, 54,579 (Oct. 21, 1995) (blocking assets of persons who "play a significant role in international narcotics trafficking centered in Colombia"); Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters, Exec. Order No. 13382, 70 Fed. Reg. 38,567 (June 28, 2005) (blocking assets of persons who have engaged in transactions that have materially contributed to the proliferation of weapons of mass destruction and their supporters); Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, Exec. Order No. 13224, 66 Fed. Reg. 49,079, 49,079 (Sept. 23, 2001) (blocking assets of persons determined "to have committed, or to pose a significant risk of committing, acts of terrorism that threaten" U.S. national security).

In October 2001, Congress amended IEEPA through the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act"), Pub. L. No. 107-56, 115 Stat. 272 (2001). Among other things, those amendments provided that, in the case of judicial review of an IEEPA-based blocking designation, an agency record containing classified information "may be submitted to the reviewing court ex parte and in camera." 50 U.S.C. § 1702(c), added by USA PATRIOT Act § 106, 115 Stat. at 278.

### b.    The Global Magnitsky Human Rights Accountability Act

Building upon and supplementing the Executive Branch's authority under IEEPA, the Global Magnitsky Human Rights Accountability Act authorizes the President to deny entry into the United States, revoke any already-issued visa, block property under U.S. jurisdiction of, and

4

prohibit U.S. persons from entering into transactions with, any foreign person identified as engaging in certain types of human rights violations or corruption. Regarding corruption, the Act authorizes the President to impose sanctions on any foreign "government official, or a senior associate of such an official," that the President determines is "responsible for, or complicit in, ordering, controlling, or otherwise directing, acts of significant corruption, including the expropriation of private or public assets for personal gain, corruption related to government contracts or the extraction of natural resources, bribery, or the facilitation or transfer of the proceeds of corruption to foreign jurisdictions." 22 U.S.C. § 10102(a)(3).

### c.    Blocking the Property of Persons Pursuant to Executive Order 13818

On December 20, 2017, the President issued E.O. 13818, "Blocking the Property of Persons Involved in Serious Human Rights Abuse or Corruption." The President specifically asserted that he was enacting the order "[b]y the authority vested in [the] President by the Constitution and the laws of the United States of America, including . . . IEEPA, . . . the National Emergencies Act (50 U.S.C. 1601 *et seq.*) (NEA), the Global Magnitsky Human Rights Accountability Act, . . . section 212(f) of the Immigration and Nationality Act of 1952 (8 U.S.C. 1182(f)) (INA), and section 301 of title 3, United States Code[.]" E.O. 13818. In the order, the President determined that "the prevalence and severity of human rights abuse and corruption that have their source, in whole or in substantial part, outside the United States . . . have reached such scope and gravity that they threaten the stability of international political and economic systems." *Id.* (further "determin[ing] that serious human rights abuse and corruption around the world constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States"). The President went on to explain that "[t]he United States seeks to impose tangible and significant consequences on those who commit serious human rights abuse or engage

in corruption, as well as to protect the financial system of the United States from abuse by these same persons." *Id.* As a consequence, the President declared a national emergency to counter serious human rights abuse and corruption threats, blocking the property and interests in property of:

> (ii) any foreign person determined by the Secretary of the Treasury, in consultation with the
Secretary of State and Attorney General:
> . . .
> (B) to be a current or former government official, or a person acting for or on behalf of such
> an official, who is responsible for or complicit in, or has directly or indirectly engaged in:
> (1) corruption, including the misappropriation of state assets, the expropriation of private assets for personal gain, corruption related to government contracts or the extraction of natural resources, or bribery; or
> (2) the transfer or the facilitation of the transfer of the proceeds of corruption[.]

*Id.* § 1(a)(ii).

The Executive Order further authorizes the Secretary of the Treasury, in consultation with the Secretary of State, "to take such actions, including adopting rules and regulations, and to employ all powers granted to me by IEEPA and the [Global Magnitsky Human Rights Accountability] Act as may be necessary to implement this order," and to re-delegate such functions as needed. *Id.* § 8. Subsequently, the Secretary of the Treasury delegated to the Director of OFAC the authority to block persons under the Executive Order. *See* 31 C.F.R. § 583.802.

Persons designated by OFAC pursuant to E.O. 13818 (as well as other authorities) are referred to as "Specially Designated Nationals or Blocked Persons" ("SDNs"). OFAC maintains a list of such individuals or entities whose assets are blocked on the SDN List. Once designated, an SDN may at any time "seek administrative reconsideration" of the designation or may assert "that the circumstances resulting in the designation no longer apply." 31 C.F.R. § 501.807. In doing so, the SDN "may submit arguments or evidence that the person believes establishes that insufficient

6

basis exists for the sanction," and may also "propose remedial steps on the person's part . . . which the person believes would negate the basis for sanction." *Id.* § 501.807(a). Additionally, the SDN may request a meeting with OFAC. *See id.* § 501.807(c). After conducting a review, OFAC will "provide a written decision" to the SDN. *Id.* § 501.807(b)(3). OFAC's regulations do not limit the number of times an SDN may seek to challenge his designation administratively. *See generally id.* § 501.807.

## II.    Factual Background

### a.  OFAC's Designation of Plaintiff Pursuant to Executive Order 13818

On June 2, 2021, OFAC publicly announced the designation of Plaintiff pursuant to E.O. 13818. The U.S. Department of the Treasury issued a press release describing the grounds for Plaintiff's designation. *See* U.S. Dep't of Treasury, Press Release, *Treasury Sanctions Influential Bulgarian Individuals and Their Expansive Networks for Engaging in Corruption* (June 2, 2021), https://home.treasury.gov/news/press-releases/jy0208 ("Press Release"), *see* Administrative Record ("AR") at 25-29. Specifically, the press release explained:

- Plaintiff "bribed government officials on several occasions" including "a current political leader and the former Chairman of the now-abolished State Commission on Gambling (SCG)." *Id*.

- Plaintiff "planned to provide a sum of money to a former Bulgarian official and a Bulgarian politician […] to help Bojkov create a channel for Russian political leaders to influence Bulgarian government officials." *Id*.

- Plaintiff "evaded Bulgarian extradition on a number of charges levied in 2020, including leading an organized crime group, coercion, attempted bribery of an official, and tax evasion." *Id*.

- The Prosecutor's Office of the Republic of Bulgaria found that "in February 2018, Bojkov paid the then-Chair of the SCG 10,000 Bulgarian Lev (approximately $6,220) on a daily basis to revoke Bojkov's competitors' gambling licenses." *Id*. After this "massive bribery scheme, the Chair of the SCG resigned, was arrested, and the SCG was abolished," and "[t]here remains an international warrant for Bojkov's arrest as his influence continues in Bulgaria." *Id*.

- Plaintiff, "[i]n advance of the July 2021 Bulgarian parliamentary elections," had "registered a political party that will run candidates […] to target Bulgarian politicians and officials." *Id*.

- 58 entities, "registered in Bulgaria that are owned or controlled by Bojkov or one of his companies" have been designated by OFAC. *Id*.

**d.      Plaintiff's Petition for Administrative Reconsideration**

In response to this designation, Plaintiff, on March 12, 2022, submitted a petition for administrative reconsideration to OFAC seeking recission of his designation and removal from the SDN List. *See* AR at 196-212. In this petition, Plaintiff advanced two bases for delisting: (1) that "the factual basis for his designation is in error," and (2) "a change in circumstances demonstrating that the circumstances which gave rise to designation no longer apply." AR at 207. Specifically, he asserted that the mentions of bribery made by OFAC in its Press Release are false and that Plaintiff was instead "the victim of an extortion racket perpetuated by Bulgarian government officials[.]" AR at 208. Plaintiff also denied "planning to pay any unidentified Bulgarian official or politician to create a channel for Russian political leaders to influence Bulgarian officials[,]" and denied evading Bulgarian extradition. AR at 209. Plaintiff then claimed that the nationalization of the Bulgarian lottery industry, the abolition of the SCG, and severed ties with Bulgarian officials

8

and the Bulgarian government constituted changes in circumstances that warranted removal from the SDN List. *See* AR at 211-212.

On June 17, 2022, OFAC issued a questionnaire to Plaintiff, asking for narrative responses to additional questions. Plaintiff responded to the questionnaire on September 15, 2022. On April 2, 2023, Plaintiff submitted to OFAC a supplement of his petition. The supplement included a request for a meeting with OFAC. In response to the meeting request in Plaintiff's supplement, Plaintiff's counsel met with OFAC on June 14, 2023. On October 10, 2023, Plaintiff submitted to OFAC a second supplement of his petition. On November 21, 2023, OFAC issued a second questionnaire asking for narrative responses to additional questions based on the two supplements to the petition. Plaintiff responded to the questionnaire on February 19, 2024. On June 15, 2024, Plaintiff supplemented his petition for a third time, and on July 1, 2024, OFAC sent Plaintiff another questionnaire. Plaintiff responded to OFAC's third questionnaire on August 15, 2024. On November 14, 2024, Plaintiff sought a status update regarding OFAC's adjudication of the petition. On December 12, 2024, OFAC responded and confirmed they were working to adjudicate the petition. On July 8, 2025, Plaintiff sought a second status update and OFAC responded that they were still working to adjudicate the petition.

## III.    Procedural History

Plaintiff Vassil Bojkov filed this lawsuit on October 8, 2025, naming as Defendants OFAC and Bradley T. Smith, in his official capacity as the Director of OFAC. In the original complaint, Plaintiff alleged that Defendants' failure to adjudicate his petition constituted unreasonable delay and disparate treatment under the APA. *See gen*. ECF No. 1. On December 5, 2025, OFAC adjudicated Plaintiff's petition and informed Plaintiff of its decision to deny Plaintiff's request for reconsideration and removal from the SDN list ("Denial Letter"). *See* AR at 139-140.

The Denial Letter provides that OFAC "carefully reviewed all the arguments and evidence [Plaintiff] provided, as well as other information available to OFAC, and determined that [Plaintiff] has not established that an insufficient basis exists for his sanction or that circumstances resulting in the sanction no longer apply pursuant to 31 CFR § 501.807." *Id*. Specifically, the Denial Letter references Plaintiff's assertions of extortion, but notes that Plaintiff "did in fact make payments to Bulgarian government officials in exchange for preferential treatment" and "does not refute having made these payments." *Id*. The Denial Letter also provides that the abolishment of the SCG and alleged severance of ties with Bulgarian officials "do not demonstrate a change in circumstances of [Plaintiff's] designation pursuant to E.O. 13818 sufficient to warrant removal from the SDN List." OFAC explains this decision is based on information available to OFAC that "indicates that [Plaintiff] remains under investigation in Bulgaria for various alleged criminal activities, including those that involve the same activities that formed the basis for his designation" along with information that indicates Plaintiff engaged in sanctionable post-designation conduct. *Id*. Lastly, the Denial Letter provides that Plaintiff's proposed remedial steps including "provision of financial and other disclosures to OFAC, commitments to promote anti-corruption reform in the country, and notifications of new business activity. . .would not sufficiently demonstrate that the type of conduct forming the basis of his designation has ceased[.]" *Id*. OFAC puts forth the example that the remedial steps "do not adequately address the past conduct for which [Plaintiff] was designated or similar activities for which [Plaintiff] remains under criminal investigation in Bulgaria[,]" nor would the steps "prevent [Plaintiff] from, in the future, engaging in the sanctionable activity that led to his designation." *Id*.

Following OFAC's denial of his petition for reconsideration, Plaintiff filed an Amended Complaint. *See* ECF No. 7. On April 2, 2026, Defendants transmitted to Plaintiff an unclassified,

non-privileged version of the Administrative Record underlying OFAC's decision to deny Plaintiff's petition for reconsideration. On May 11, 2026, Plaintiff filed a Second Amended Complaint ("SAC"). Bringing only one claim, Plaintiff alleges that Defendants' denial of Plaintiff's petition for reconsideration constitutes arbitrary and capricious agency action in violation of the APA. SAC ¶¶ 88-101, ECF No. 11.

## **LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b)(6) requires a complaint to be sufficient to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted); *accord Grant v. Ent. Cruises, Inc.*, 282 F. Supp. 3d 114, 116 (D.D.C. 2017). The district court "must treat the complaint's factual allegations as true, and must grant [Plaintiff] the benefit of all inferences that can be derived from the facts alleged." *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1240-41 (D.C. Cir. 2018) (quoting *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000)). However, Plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that the district court does not need to accept as true legal conclusions set forth in the Complaint).

Federal Rule of Civil Procedure Rule 12(d) authorizes the court to treat a Rule 12(b)(6) motion as a motion for summary judgment where the defendants rely on matters outside the pleadings, provided that all parties have a reasonable opportunity to present all material pertinent to the motion. Fed. R. Civ. P. 12(d); Fed. R. Civ. P. 56; *see Search v. Uber Techs., Inc.*, 128 F. Supp. 3d 222, 228 (D.D.C. 2015) (citing *Yates v. Dist. of Columbia*, 324 F.3d 724, 725 (D.C. Cir. 2003)). Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if

11

the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Conant v. Wells Fargo*, 60 F. Supp. 3d 99, 107 (D.D.C. 2014). In the context of an APA claim, "[s]ummary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Zevallos v. Obama*, 10 F. Supp. 3d 111, 117 (D.D.C. 2014) (quoting *Kadi v. Geithner*, 42 F. Supp. 3d 1, 9 (D.D.C. 2012), noting the court's "limited role . . . in reviewing the administrative record," and explaining that "[w]hen assessing a summary judgment motion in an APA case, the district judge sits as an appellate tribunal" (citation modified)), *aff'd*, 793 F.3d 106 (D.C. Cir. 2015).

## ARGUMENT

### I. OFAC's Decision to Deny Plaintiff's Petition for Administrative Reconsideration Was Not Arbitrary and Capricious

Plaintiff's sole claim, that OFAC acted arbitrarily and capriciously in denying Plaintiff's petition for reconsideration, is entirely refuted by the administrative record, as explained in full below. For that reason, and in light of the highly deferential standard of review required in these circumstances, OFAC's decision is not in violation of the APA and Plaintiff's complaint should be dismissed.

#### a. OFAC's Decision Is Entitled to a Heightened Deferential Standard Because This Case Involves National Security and Foreign Affairs

When evaluating claims brought pursuant to the APA, a court's review of an agency decision is limited to the administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (citation omitted). Under the APA, this Court may hold unlawful and set aside an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law." 5 U.S.C. § 706(2)(A). An agency's decision is presumed valid, and a court reviews

12

only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *accord City of Huntington v. U.S. Dep't of Hous. & Urb. Dev.*, 466 F. Supp. 3d 30, 32 (D.D.C. 2020). Under this deferential standard, an agency's decision may be deemed arbitrary and capricious only in circumstances where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or its decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court may not "substitute its judgment for that of the agency"; rather, the agency's decision should be affirmed as long as it is supported by a rational basis and substantial evidence. *Id.* at 43–44 (explaining that courts must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned" and there exists a "rational connection between the facts found and the choice made"); *see also, e.g., Epsilon Elecs., Inc. v. U.S. Dep't of the Treasury, OFAC*, 857 F.3d 913, 925 (D.C. Cir. 2017) (noting, on review of an OFAC designation, that the "APA's substantial evidence standard requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence" (citation modified)).

This deferential standard is further heightened in cases, such as this one, that involve national security and foreign affairs. *See e.g.*, *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007) ("[O]ur review—in an area at the intersection of national security, foreign policy, and administrative law—is extremely deferential."); *Lopez Bello v. Smith*, 651 F. Supp. 3d 20, 32 (D.D.C. 2022), *aff'd sub nom. Bello v. Gacki*, 94 F.4th 1067 (D.C. Cir. 2024). As the Supreme Court has recognized, such a heightened standard is warranted because of the

13

Executive Branch's expertise on national security and foreign affairs issues. *See, e.g.*, *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–34 (2010). And Courts have applied this heightened deferential standard in economic sanctions cases, such as the instant matter. *See Karadzic v. Gacki*, 602 F. Supp. 3d 103, 115 (D.D.C. 2022) (recognizing that when assessing an OFAC agency action the "standard of review in the APA context is not demanding . . . [and] [t]his is especially true when the actions under review involve foreign affairs and national security"); *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 94 (D.D.C. 2021) ("Deference for agency decision-making is heightened in the context of executive blocking decisions, which lie 'at the intersection of national security, foreign policy, and administrative law.'" (quoting *Islamic Am. Relief Agency*, 477 F.3d at 734)); *Olenga v. Gacki*, 507 F. Supp. 3d 260, 280 (D.D.C. 2020) ("The D.C. Circuit has shown extreme deference to blocking orders, which fall at the intersection of national security, foreign policy, and administrative law." (citation modified)); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 84 (D.D.C. 2002) ("Blocking orders are an important component of U.S. foreign policy, and the President's choice of this tool to combat terrorism is entitled to particular deference."), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003); *Diegelmann v. Yellen*, No. CV 24-1090 (JEB), 2024 WL 4880468, at *6 (D.D.C. Nov. 25, 2024) ("The D.C. Circuit, moreover, has urged courts to be extremely deferential to executive blocking orders") (quotation marks omitted); *Zevallos*, 10 F. Supp. 3d at 119 (similar).

### b. OFAC's Denial of Plaintiff's Petition for Administrative Reconsideration is Based on Credible, Substantial Evidence in Accordance with the APA (Count I)

OFAC's well-reasoned decision to deny Plaintiff's petition for reconsideration easily satisfies the APA's highly deferential standard and forecloses Plaintiff's only claim. OFAC's Denial Letter sets forth—and the unclassified administrative record supports—the substantial evidence underlying OFAC's denial of Plaintiff's petition. In denying Plaintiff's petition, OFAC

explained that it had reached its determination after it "carefully reviewed all the arguments and evidence that [Plaintiff] provided, as well as other information available to OFAC[.]" AR at 139-140. Indeed, OFAC relied on ample record evidence to support the denial of Plaintiff's petition, including (1) Plaintiff's acknowledgments of post-designation business enterprise operations in the gambling sector, (2) information contradicting that Plaintiff paid all his taxes, (3) the former Chairman of the SCG's confession to initiating schemes to help Plaintiff, (4) a July 5, 2024 article regarding a newly opened case against Plaintiff in a Bulgarian court, and (5) the United Kingdom's addition of Plaintiff to its sanctions list under the Global Anti-Corruption Sanctions Regulations in 2023. *See* AR at 153-161. OFAC carefully reviewed all available information, explained its reasoning in the Denial Letter to Plaintiff, and reached a decision thoroughly supported by the record. Consistent with binding precedent, the Court should afford due consideration to OFAC's decision. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc*, 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency.").

Plaintiff alleges, unpersuasively, that OFAC's denial of Plaintiff's petition for reconsideration violated the APA for a multitude of reasons. Among these reasons, Plaintiff alleges that Defendants acted arbitrarily and capriciously "in concluding that [Plaintiff's] alleged payments to Bulgarian officials constituted sanctionable conduct regardless of whether they were extortion payments or bribes due to his alleged receipt of preferential treatment and enrichment." SAC ¶ 90. Both the Denial Letter and the underlying AR consider Plaintiff's allegations of extortion and thus rebut Plaintiff's accusations that OFAC's determination was unsupported and conclusory. The Denial Letter acknowledges that Plaintiff did in fact make payments—and does not refute having made those payments—to Bulgarian officials in exchange for preferential

15

treatment of his businesses that substantially enriched Plaintiff. AR at 139-140. OFAC, in the denial memorandum, notes that Plaintiff's bribery scheme of revoking competitor's gambling licenses demonstrates a "pattern of practice that calls into question" Plaintiff's description of an extortion scheme. *Id.* at 153. Further, OFAC states that "the former Chairman of the SCG confessed to initiating schemes to help [Plaintiff] after the former Chairman's arrest[.]" *Id.* Plaintiff also alleges that OFAC acted arbitrarily and capriciously by failing to explain the significance of preferential treatment and enrichment and by failing to consider the coerced nature of the payments. SAC ¶ 90. Yet, the denial memorandum notes that "even if [Plaintiff's] assertion that the corruption scheme. . .was extortion, this allegation is not exculpatory of the basis for designation, as [Plaintiff] did not disprove, let alone dispute, the existence of the bribery scheme itself in other instances, was an active participant in it, and indeed enjoyed significant profits from such scheme." AR at 153. Thus, OFAC's consideration and dismissal of Plaintiff's descriptions of extortion demonstrates well-reasoned decision making well beyond the requisite basis.

Next, Plaintiff alleges that OFAC acted arbitrarily and capriciously when concluding that Plaintiff's asserted changes in circumstances were insufficient to warrant removal from the SDN List. *See* SAC ¶¶ 93-97. Plaintiff considers the relevant changes in circumstances to include "the abolishment of the SCG, the nationalization of the Bulgarian lottery industry, the insolvency of [Plaintiff's] lottery businesses, and the severance of ties with Bulgarian officials." *Id.* ¶ 93. But the administrative record clearly demonstrates OFAC's consideration of Plaintiff's asserted changes in circumstances and explanation as to why the changes are insufficient. Specifically, the Denial Letter confirms that Plaintiff's "assertions do not demonstrate a change in circumstances of [Plaintiff's] designation pursuant to E.O. 13818 sufficient to warrant removal," and that "[i]nformation available to OFAC indicates that [Plaintiff] remains under investigation in Bulgaria

16

for various alleged criminal activities, including those that involve the same activities that formed the basis of his designation." AR 139-140. The record also reflects that Plaintiff "acknowledged to OFAC that, post-designation, he had operated business enterprises in the gambling sector, in which [Plaintiff] had previously engaged in corrupt activities." *Id.* at 155. The record puts forth additional evidence, including a July 5, 2024 article regarding a newly opened case against Plaintiff in a Bulgarian court and a February 10, 2023 sanctions designation by the United Kingdom. *Id.* at 157. Plaintiff alleges that Defendants failed to explain why Plaintiff's proposed evidence is insufficient and failed to explain why Defendants' evidence *is* sufficient.[2] SAC ¶¶ 94-98. Yet, Defendants presented and considered ample evidence in support of OFAC's decision to deny Plaintiff's petition and need not further explain why Plaintiff's proposed evidence is insufficient or why Defendants' evidence *is* sufficient. *See, e.g.*, *Karadzic*, 602 F. Supp. 3d at 114 ("OFAC assembled sufficient evidence for its refusal to delist [the plaintiff] and, as seen by its in-depth discussion in the administrative record, scrutinized that evidence. That is all the law requires of it.").

Finally, Plaintiff argues that OFAC acted arbitrarily and capriciously in concluding that Plaintiff's proposed remedial measures would not negate the basis for designation. *See* SAC ¶¶ 97-100. Yet, OFAC provides a well-reasoned explanation, stating "the proposed remedial steps do

---

[2] Plaintiff alleges that Defendants "failed to address the reliability" of certain evidence and characterized additional evidence as "unverified media reports[.]" SAC ¶¶ 95, 97. To the extent Plaintiff is calling into question the credibility of Defendants' evidence, Plaintiff provides no reason to doubt the agency's fact-finding process, which prior decisions in this Circuit have upheld against similar challenges. *E.g.*, *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003) (rejecting challenge to OFAC's use of hearsay evidence); *Zevallos*, 10 F. Supp. 3d at 123 n.9 (finding unpersuasive plaintiff's argument that "OFAC relied on 'outdated, biased, and incredible sources'"; plaintiff "made these arguments to OFAC, . . . OFAC concluded that the evidence before it *was* credible, . . . [and] [i]t is not the province of this Court to reweigh the evidence and reconsider [plaintiff's] arguments on appeal" (citation omitted)).

not adequately address the past conduct for which [Plaintiff] was designated or similar activities for which [Plaintiff] remains under criminal investigation in Bulgaria." AR 139-140. Indeed, the denial memorandum reinforces the weakness of Plaintiff's argument by illustrating examples of Plaintiff's ongoing, post-designation sanctionable conduct. Specifically, the record provides that Plaintiff (1) "allegedly operates business enterprises in the gambling sector, in which [Plaintiff] had previously engaged in corrupt activities," (2) "has launched a new political party and has publicly accused other politicians of corruption," and (3) "has been involved in serious corruption . . . following the date of OFAC's designation[.]" AR at 156. The record concludes that "OFAC has not seen evidence that [Plaintiff] has moved past the businesses and activities forming the basis of his designation." *Id*. For the reasons provided above, and in light of the heightened deferential standard afforded to cases involving concerns of national security and foreign affairs, OFAC's explanation as to the insufficiency of Plaintiff's remedial measures clearly surpasses the APA's "minimal standards of rationality[.]" *Holy Land Found. for Relief & Dev.*, 219 F. Supp. 2d at 74.

In sum, Defendants reasonably determined that Plaintiff's petition for administrative reconsideration should be denied, and such determination is supported by substantial evidence. There is no basis to conclude that Defendants violated the APA. *See Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 42-43 (holding that an agency's decision is not arbitrary or capricious if it has a rational basis); *Airmotive Eng'g Corp. v. FAA*, 882 F.3d 1157, 1159 (D.C. Cir. 2018) (concluding that an agency's finding of fact are "conclusive" when "supported by substantial evidence" meaning information that "a reasonable mind might accept as adequate to support a conclusion" (citations omitted)).

And although the information from the unclassified record, as explained above, provides sufficient evidence to support OFAC's decision to deny Plaintiff's petition, Defendants will lodge

18

with the Court the full evidentiary memorandum and supporting exhibits, including any classified or otherwise protected information, *ex parte*, *in camera*, as permitted by IEEPA. *See* 50 U.S.C. §1702(c) ("In any judicial review of a determination made under this section, if the determination was based on classified information . . . such information may be submitted to the reviewing court ex parte and in camera."). *Cf. Zevallos v. Obama*, 793 F.3d 106, 117 (D.C. Cir. 2015) (concluding that due process only requires the disclosure of unclassified information underpinning a designation).

### CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their motion to dismiss or, in the alternative, for summary judgment.

Dated: June 10, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

STEPHEN M. ELLIOTT
Assistant Director
Federal Programs Branch


*/s/  Jacqueline C. Lau*
JACQUELINE C. LAU
(DC Bar No. 90024952)
Trial Attorney
U.S. Department of Justice, Civil Division
Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
(202) 598-0914
Jacqueline.C.Lau@usdoj.gov

*Counsel for Defendants*