**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **VASSIL BOJKOV** <br>     43 Moskovska Street <br>     Sofia 1000 <br>     Bulgaria <br><br>           *Plaintiff,* <br><br>     v. <br><br> **BRADLEY T. SMITH, in his official capacity as** <br>     **Director of the United States** <br>     **Department of the Treasury,** <br>     **Office of Foreign Assets Control** <br>     *et. al.,* <br><br>           *Defendants,* | Case No. 1:25-cv-3617 |

**<u>MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT, AND A CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

INTRODUCTION.....................................................................................................................1

BACKGROUND ....................................................................................................................2

    I.      Statutory and Regulatory Background..................................................................2

          a.   International Emergency Economic Powers Act ..............................................2

          b.   Executive Order 13818 ...................................................................................3

          c.   Global Magnitsky Sanctions Regulations .......................................................4

    II.     Statement of Facts.................................................................................................4

          a.   OFAC's Designation of Mr. Bojkov Under E.O. 13818 .................................4

          b.   Mr. Bojkov's Petition for Administrative Reconsideration.............................5

          c.   OFAC's Delay and the Commencement of This Action .................................7

          d.   OFAC's Denial of the Petition.........................................................................8

          e.   OFAC's Disclosure of the Denial Administrative Record ..............................9

    III.   Legal Standards...................................................................................................10

          a.   Summary Judgment Standard ........................................................................10

          b.   Motion to Dismiss Standard...........................................................................11

ARGUMENT.........................................................................................................................12

    I.      OFAC's Denial is Subject to Record-Based Arbitrary and Capricious Review...12

    II.     OFAC's Denial of Mr. Bojkov's Petition for Administrative Reconsideration Is Arbitrary, Capricious, and Unsupported by Substantial Evidence, in Violation of the APA.................................................................................................................14

          a.   OFAC Failed To Confront Mr. Bojkov's Extortion and Coercion Evidence, and Instead Substituted a Conclusory Recharacterization of the Conduct as Bribery. ..........................................................................................................15

b.  OFAC's Change in Circumstances Determination Rests on Evidence That Is Either Disconnected From the Basis for Designation or Impermissibly Conclusory. ..............................................................................................22

c.  OFAC's Rejection of the Proposed Remedial Measures Is Conclusory and Unsupported by Reasoned Decisionmaking. ...................................................30

**CONCLUSION** ........................................................................................................................31

## TABLE OF AUTHORITIES

**CASES**

*Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*,
525 F.3d 8 (D.C. Cir. 2008) ........................................................................................... 12

*Amerijet Int'l, Inc. v. Pistole*,
753 F.3d 1343 (D.C. Cir. 2014) ..................................................................................... 15

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................................................................................ 11

*Animal Legal Def. Fund, Inc. v. Perdue*,
872 F.3d 602 (D.C. Cir. 2017) ....................................................................................... 29

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................................ 12

*Auer v. Robbins*,
519 U.S. 452 (1997) ........................................................................................................ 18

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................................ 11

*Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*,
419 U.S. 281 (1974) ........................................................................................................ 12

*Browning v. Clinton*,
292 F.3d 235 (D.C. Cir. 2002) ....................................................................................... 11

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962) .................................................................................................. 2, 12

*Butte County v. Hogen*,
613 F.3d 190 (D.C. Cir. 2010) ....................................................................................... 15

*Carter v. George Washington Univ.*,
387 F.3d 872 (D.C. Cir. 2004) ....................................................................................... 11

*Diegelmann v. Yellen*,
No. 24-1090 (JEB), 2024 WL 4880468 (D.D.C. Nov. 25, 2024) ................................. 29

*Epsilon Elecs., Inc. v. U.S. Dep't of Treasury, Off. of Foreign Assets Control*,
857 F.3d 913 (D.C. Cir. 2017) .......................................................................... 13, 25, 27

*Genuine Parts Co. v. EPA*,
    890 F.3d 304 (D.C. Cir. 2018) ..................................................................................16

*Herron v. Fannie Mae*,
    861 F.3d 160 (D.C. Cir. 2017) ..................................................................................11

*Joumaa v. Mnuchin*,
    798 F. App'x 667 (D.C. Cir. 2020) ................................................................ 13, 22, 30

*Kadi v. Geithner*,
    42 F. Supp. 3d 1 (D.D.C. 2012) ................................................................................11

*Karadzic v. Gacki*,
    602 F. Supp. 3d 103 (D.D.C. 2022) ...................................................................*passim*

*KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner*,
    710 F. Supp. 2d 637 (N.D. Ohio 2010) .....................................................................13

*King & Spalding LLP v. U.S. Dep't of Health and Human Servs.*,
    330 F. Supp. 3d 477 (D.D.C. 2018) ..........................................................................11

*Kisor v. Wilkie*,
    588 U.S. 558 (2019) ..................................................................................................18

*Loper Bright Enterprises v. Raimondo*,
    603 U.S. 369 (2024) ..................................................................................................17

*Lopez v. Council on Am.-Islamic Relations Action Network, Inc.*,
    826 F.3d 492 (D.C. Cir. 2016) ..................................................................................11

*Luokung Tech. Corp. v. U.S. Dep't of Def.*,
    538 F. Supp. 3d 174 (D.D.C. 2021) .............................................................23, 25, 26

*Marshall Cnty. Health Care Auth. v. Shalala*,
    988 F.2d 1221 (D.C. Cir. 1993) ................................................................................11

*Morall v. DEA*,
    412 F.3d 165 (D.C. Cir. 2005) ...........................................................................*passim*

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..............................................................................................*passim*

*People's Mojahedin Org. of Iran v. United States Dep't. of State*,
    613 F.3d 220 (D.D.C. July 16, 2010)........................................................................23

iv

*Roelofs v. Secretary of the Air Force,*
   628 F.2d 594 (D.C. Cir. 1980) ........................................................................... 31

*Tourus Records, Inc. v. DEA,*
   259 F.3d 731 (D.C. Cir. 2001) ................................................................. 14, 15, 31

*United States v. Addonizio,*
   451 F.2d 72 (3d Cir. 1971) ............................................................................. 1, 16

*United States v. French,*
   628 F.2d 1069 (8th Cir. 1980) ..................................................................... 18, 19

*United States v. Rivera-Rangel,*
   396 F.3d 476 (1st Cir. 2005) ............................................................................. 19

*United States v. Thompson,*
   647 F.3d 180 (5th Cir. 2011) ............................................................................ 19

*Van Loon v. Department of the Treasury,*
   122 F.4th 549 (5th Cir. 2024) ...................................................................... 13, 17

*Williams-Jones v. LaHood,*
   656 F. Supp. 2d 63 (D.D.C. 2009) ..................................................................... 11

*Xiaomi Corp. v. Dep't of Def.,*
   No. 21-280 (RC), 2021 WL 950144 (D.D.C. Mar. 12, 2021) ................................ 23, 26, 28

*Zevallos v. Obama,*
   10 F. Supp. 3d 111 (D.D.C. 2014) .......................................................... 11, 13, 21

*Zevallos v. Obama,*
   793 F.3d 106 (D.C. Cir. 2015) .................................................................... 22, 24

**STATUTES**

5 U.S.C. § 706 ................................................................................................ 30

50 U.S.C. § 1701 ............................................................................................... 2

50 U.S.C. § 1702 ............................................................................................... 3

**RULES**

FED. R. CIV. P. 56 ............................................................................................ 10

**ADMINISTRATIVE MATERIALS**

31 C.F.R. § 501.807 ..............................................................................................4, 22, 26

31 C.F.R. Part 583 ......................................................................................................2, 4

Blocking the Property of Persons Involved in Serious Human Rights Abuse or Corruption,
Executive Order No. 13818
82 Fed. Reg. 60,839 (Dec. 26, 2017) .................................................................3, 17, 26

Notice of OFAC Sanctions Actions,
    86 Fed. Reg. 30,517 (June 8, 2021) .........................................................................4

**OTHER MATERIALS**

U.S. Dep't of the Treasury, *Treasury Sanctions Influential Bulgarian Individuals and Their Expansive Networks for Engaging in Corruption*, June 2, 2021,
    https://home.treasury.gov/news/press-releases/jy0208....................................4, 5, 22

Black's Law Dictionary (12th ed. 2024) ......................................................................16

Rollin M. Perkins & Ronald N. Boyce, Criminal Law 538 (3d ed. 1982) ..................16

**INTRODUCTION**

OFAC designated Vassil Bojkov under Executive Order ("E.O.") 13818 on the ground that he had engaged in "bribery" of Bulgarian officials. Four years of reconsideration proceedings produced an administrative record establishing that the payments at issue were not voluntary bribes at all, but rather sums extracted by a sitting Prime Minister and Finance Minister who wielded the machinery of the Bulgarian state against him. OFAC did not dispute that showing — it accepted the facts and then treated them as beside the point. In the agency's reasoning, the commercial benefit Mr. Bojkov derived from submitting to his extorters erased any meaningful line between voluntary corruption and coerced compliance. The law draws precisely that line: "while the essence of bribery is voluntariness, the essence of extortion is duress," *United States v. Addonizio*, 451 F.2d 49, 72 (3d Cir. 1971). And extortion succeeds for exactly the reason OFAC invoked — the victim's compliance yields some benefit; were it otherwise, the coercive threat would have no purchase.

The record before OFAC likewise establishes that Mr. Bojkov undertook precisely what the agency's own delisting guidance contemplates as a "positive change in behavior." He exited the gambling industry altogether. The state instrumentality through which the alleged corruption operated—the State Commission on Gambling ("SCG")—was abolished, and the Bulgarian lottery industry was nationalized. He severed ties with the officials at the center of the alleged scheme. He surrendered to Bulgarian authorities to face the very proceedings he was accused of evading. He answered three rounds of OFAC questionnaires. And he proposed concrete, verifiable remedial measures to assure OFAC that no sanctionable conduct would recur. OFAC's answer was a denial that identified no change in circumstances or remedial measure that would ever suffice for delisting, declined to engage the coercion-versus-voluntariness question at the core of the

1

corruption inquiry, and ceded its fact-finding to an unfinished foreign investigation, unverified press reports, and a parallel foreign listing.

The Government now asks this Court to bless that decision under a banner of "extreme deference." But deference is not abdication. Even the most deferential review requires the agency to examine the relevant data, engage the petitioner's central arguments, and articulate a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Because OFAC's denial does none of these things, the Court should deny Defendants' motion to dismiss or, in the alternative, for summary judgment; grant Mr. Bojkov's cross-motion for summary judgment; vacate the denial of the Petition; and remand to the agency.

## BACKGROUND

### I.    STATUTORY AND REGULATORY BACKGROUND

#### A.    *International Emergency Economic Powers Act*

The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, is the statutory basis for most U.S. economic sanctions administered by Defendants, including those imposed under E.O. 13818 and the Global Magnitsky Sanctions Regulations ("GMSR"), 31 C.F.R. Part 583. IEEPA authorizes the President "to deal with any unusual and extraordinary threat, which has its source in whole or in substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). IEEPA provides the President the power to "regulate, . . . prevent or prohibit, . . . any importation or exportation of, or dealing in, . . . . transactions involving, any property in which any foreign country or a national thereof has any

2

interest by any person, or with respect to any property, subject to the jurisdiction of the United States." 50 U.S.C. § 1702(a)(1)(B).

      B.      *Executive Order 13818*

On December 20, 2017, invoking IEEPA, the National Emergencies Act ("NEA"), 50 U.S.C. § 1601 *et seq.*, and the Global Magnitsky Human Rights Accountability Act, Public Law 114-328, the President issued E.O. 13818, "Blocking the Property of Persons Involved in Serious Human Rights Abuse or Corruption." 82 Fed. Reg. 60,839 (Dec. 26, 2017). The Order declares a national emergency with respect to "serious human rights abuse and corruption around the world" and blocks the property and interests in property of, among others, any foreign person determined by the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, to have "materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of" "corruption, including the misappropriation of state assets, the expropriation of private assets for personal gain, corruption related to government contracts or the extraction of natural resources, or bribery"—that is conducted by a foreign person. *Id.* § 1(a)(iii)(A)(1).

Persons designated under the Order are added to OFAC's Specially Designated Nationals and Blocked Persons ("SDN") List; their property and interests in property within U.S. jurisdiction are blocked; and U.S. persons are generally prohibited from transacting or dealing with them absent an applicable exemption or OFAC license. E.O. 13818 § 1(a); 31 C.F.R. § 583.201. The Order authorizes the Secretary of the Treasury to adopt implementing rules and regulations, and the Secretary has delegated that authority, including the authority to make designation and delisting determinations, to the Director of OFAC. E.O. 13818 § 8.

C.      *Global Magnitsky Sanctions Regulations*

OFAC administers E.O. 13818 through the GMSR, 31 C.F.R. Part 583, and the Reporting, Procedures and Penalties Regulations ("RPPR"), 31 C.F.R. Part 501. Once designated, a person may seek administrative reconsideration of the designation, assert that the circumstances resulting in the designation no longer apply, and may also "propose remedial steps on the person's part . . . which the person believes would negate the basis for the sanction." 31 C.F.R. § 501.807(a). After reviewing the request and any information the petitioner provides, OFAC will "provide a written decision" to the blocked person. *Id.* § 501.807(b)(3). OFAC's published guidance explains that "the ultimate goal of sanctions is not to punish, but to bring about a positive change in behavior," and identifies both "a positive change in behavior" and circumstances in which "the basis of [a] designation no longer exists" as grounds warranting removal from the SDN List. SAC ¶ 18, ECF No. 11.

## II.     STATEMENT OF FACTS

A.      *OFAC's Designation of Mr. Bojkov Under E.O. 13818*

On June 2, 2021, OFAC designated Mr. Bojkov pursuant to E.O. 13818 for allegedly having "materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of corruption, including the misappropriation of state assets, the expropriation of private assets for personal gain, corruption related to government contracts or the extraction of natural resources, or bribery." *Notice of OFAC Sanctions Action*, 86 Fed. Reg. 30,517 (June 8, 2021); U.S. Dep't of the Treasury, *Treasury Sanctions Influential Bulgarian Individuals and Their Expansive Networks for Engaging in Corruption*, June 2, 2021, https://home.treasury.gov/news/press-releases/jy0208.

The press release announcing his designation stated that Mr. Bojkov was designated for having allegedly: (i) "bribed government officials on several occasions," including "a current political leader and the former Chairman of the now-abolished" SCG; (ii) "planned to provide a sum of money to a former Bulgarian official and a Bulgarian politician" in 2021 "to help Bojkov create a channel for Russian political leaders to influence Bulgarian government officials"; (iii) "evaded Bulgarian extradition" while in Dubai on charges "levied in 2020, including leading an organized crime group, coercion, attempted bribery of an official, and tax evasion"; (iv) "paid the then-Chair of the SCG 10,000 Bulgarian Lev (approximately $6,220) on a daily basis to revoke Bojkov's competitors' gambling licenses," after which "the Chair of the SCG resigned, was arrested, and the SCG was abolished"; and (v) "registered a political party" in advance of the July 2021 Bulgarian parliamentary elections. U.S. Dep't of the Treasury, *Treasury Sanctions Influential Bulgarian Individuals and Their Expansive Networks for Engaging in Corruption*.

B.      *Mr. Bojkov's Petition for Administrative Reconsideration*

On March 12, 2022, Mr. Bojkov submitted a petition for administrative reconsideration to OFAC, seeking rescission of his E.O. 13818 designation and removal of his name from the SDN List (the "Petition"). SAC ¶ 19. The Petition argued both that (a) an insufficient basis exists for Mr. Bojkov's designation; and (b) the circumstances underlying the designation have changed such that they no longer apply.

On the insufficient basis argument, the Petition consolidated the five press-release allegations into three categories: bribery of government officials, the alleged plan for Russian influence, and evasion of Bulgarian extradition. SAC ¶ 21. As to the first, the Petition asserted that Mr. Bojkov did not make bribe payments to Bulgarian officials; rather, any payments he made were extortion payments coerced by Bulgarian officials and thus not sanctionable under E.O.

13818. SAC ¶ 22. As to the second, the Petition denied any plan to pay officials to channel Russian influence and argued, in the alternative, that neither making such plans nor registering a political party is sanctionable under E.O. 13818. SAC ¶ 23. As to the third, the Petition explained that Mr. Bojkov's arrest warrant was issued only after he was already in Dubai; that he attended the extradition proceedings; that a UAE court denied Bulgaria's extradition request for failure to provide necessary documentation; and that he had repeatedly attempted to address the Bulgarian proceedings from abroad and owed no outstanding taxes. SAC ¶ 24.

On the change in circumstances argument, the Petition asserted that the Bulgarian lottery industry had been nationalized and that the SCG, the instrumentality of the alleged corruption, had been abolished, with the result that Mr. Bojkov's lottery businesses are not operational and he has no ability to make any payments to the SCG. SAC ¶ 25.

Over the next several years, Mr. Bojkov responded to three separate OFAC questionnaires and submitted multiple supplements to the Petition. On June 17, 2022, OFAC issued its first questionnaire, to which Mr. Bojkov timely responded on September 15, 2022. That response provided detailed responses and extensive documentation, including as to his alleged payment of bribes and the status of his Bulgarian criminal proceedings, and proposing several remedial measures that, if adopted, would negate the basis for his designation. SAC ¶¶ 26–29.

On January 19, 2023, in response to Mr. Bojkov's December 18, 2021 request, OFAC disclosed an unclassified, non-privileged version of the administrative record underlying his E.O. 13818 designation. SAC ¶ 30. That record contained a redacted version of the evidentiary memorandum setting forth OFAC's asserted evidentiary basis and conclusions, together with redacted versions of the supporting exhibits. SAC ¶ 31.

On April 2, 2023, Mr. Bojkov supplemented the Petition, asserting additional arguments for delisting, providing documentation that the Bulgarian tax-evasion proceedings against him were unfounded, and requesting both a meeting with OFAC and an opportunity to address any foreign-policy guidance from the State Department. SAC ¶¶ 32–36. Although OFAC requested a preliminary meeting with undersigned counsel on June 14, 2023, and met with counsel on July 6, 2023, during which it discussed terms for a potential Terms of Removal Agreement ("TOR"), OFAC did not thereafter seek a meeting with Mr. Bojkov. SAC ¶¶ 37–39.

Mr. Bojkov supplemented the Petition again on October 10, 2023, advising OFAC that he had surrendered to Bulgarian authorities—directly addressing the allegation that he had evaded prosecution—and providing documentation of the dismissal of certain criminal charges against him for lack of evidence. SAC ¶¶ 40–42.

On November 21, 2023, OFAC issued Mr. Bojkov a second questionnaire, to which he responded on February 19, 2024. Further, Mr. Bojkov supplemented his Petition once more on June 15, 2024, with additional proposed remedial measures. Following this supplement, OFAC issued Mr. Bojkov a third and final questionnaire on July 1, 2024, which Mr. Bojkov responded to on August 15, 2024. SAC ¶¶ 43–52.

C.    OFAC's Delay and the Commencement of This Action

After Mr. Bojkov submitted his final questionnaire response on August 15, 2024, OFAC did not adjudicate the Petition. Mr. Bojkov sought a status update on November 14, 2024, to which Defendant OFAC responded on December 12, 2024 noting that it was working to adjudicate the Petition in the coming months. SAC ¶¶ 53–54. When Mr. Bojkov again raised the delay on July 8, 2025, OFAC stated on a subsequent conference call with undersigned counsel that the Petition would be adjudicated within a matter of weeks. SAC ¶ 55. Three months later, and having received

no decision, Mr. Bojkov initiated this action on October 8, 2025, alleging unreasonable delay and disparate treatment in violation of the Administrative Procedure Act ("APA"). *See* Compl. at 15–16, *Bojkov v. Smith*, No. 25-cv-03617 (D.D.C. Oct. 8, 2025), ECF No. 1.

       D.       *OFAC's Denial of the Petition*

Only after this lawsuit was filed did OFAC act. On December 5, 2025, OFAC issued a final agency action denying Mr. Bojkov's delisting request, accompanied by a letter notifying him of the reasons for the denial (the "Denial Letter"). SAC ¶ 57. The Denial Letter rested on three conclusions.

First, the Denial Letter concluded that even if Mr. Bojkov "did not bribe any Bulgarian officials, but rather, was extorted by Bulgarian government officials to pay them," he nevertheless engaged in sanctionable conduct because he "did in fact make payments to Bulgarian government officials in exchange for preferential treatment of his businesses that substantially enriched." SAC ¶ 58. Moreover, Mr. Bojkov "does not refute having made these payments." *Id*. The Denial Letter did not explain why Mr. Bojkov's alleged receipt of preferential treatment and enrichment warranted disregarding the distinction between coerced extortion payments and voluntary bribery payments, nor did it address the fact that victims of extortion may receive benefits from acquiescing to their extorters' demands. SAC ¶¶ 59–60.

Second, the Denial Letter concluded that the abolishment of the SCG and Mr. Bojkov's severance of ties with Boyko Borisov, Vladislav Goranov, and the Bulgarian government "do[] not demonstrate a change in circumstances" sufficient to warrant delisting. SAC ¶ 61. In doing so, the OFAC reasoned that Mr. Bojkov "remains under investigation in Bulgaria" and allegedly "engaged in sanctionable activity similar to that which led to his designation" after his designation. *Id*. The Denial Letter did not identify what changes in circumstances would be sufficient; did not

8

explain why the abolition of the SCG, identified in the press release as the central vehicle for the corrupt activity, was insufficient; and did not provide any dates, descriptions, or other facts regarding the alleged post-designation conduct. SAC ¶¶ 62–65.

Third, the Denial Letter concluded that Mr. Bojkov's proposed remedial measures were insufficient because they "would not sufficiently demonstrate that the type of conduct forming the basis of his designation has ceased" and "would [not] prevent" future sanctionable activity. SAC ¶ 66. The Denial Letter did not state what "type of conduct" it was referring to, did not explain why the proposed remedial measures were inadequate, and contained no explanation of what remedial measures would be sufficient to negate the basis of the designation. SAC ¶¶ 67–69.

E.    *OFAC's Disclosure of the Denial Administrative Record*

On April 2, 2026, OFAC disclosed an unclassified, non-privileged version of the administrative record underlying its decision to deny the Petition (the "denial administrative record"), which contained a redacted version of the evidentiary memorandum setting forth OFAC's basis and conclusions. SAC ¶¶ 70–71.

On the insufficient basis question, the denial administrative record rejected Mr. Bojkov's argument because he "did not refute making payments to Bulgarian officials in exchange for preferential treatment" and acknowledged paying the former Chairman of the SCG to revoke his competitors' gambling licenses. On that basis, OFAC concluded that Mr. Bojkov "was a participant in the bribery scheme and enjoyed significant profits from it." Admin. R. ("AR") at 152–153; SAC ¶ 72. The denial administrative record did not distinguish the alleged payments as either bribes or extortion; instead, it relied on the mere fact that payments were made and did not consider that Mr. Bojkov could have received benefits from payments nonetheless made under duress. AR at 152; SAC ¶ 73.

On the change in circumstances argument, OFAC denied that any change had occurred despite the nationalization of the Bulgarian lottery business, the abolition of the SCG, the defunct status of Mr. Bojkov's lottery companies, and his severance of ties with Borisov, Goranov, and the Bulgarian government. SAC ¶ 74. OFAC reasoned that Mr. Bojkov had been designated under criteria broader than payments to the SCG Chairman and that he "continues to benefit from the proceeds of corruption." AR at 154–155. OFAC, however, did not identify any specific dealing, asset, or transaction from which he continues to benefit, and never requested or addressed restitution prior to denying his petition. SAC ¶¶ 75, 77. OFAC further treated Mr. Bojkov's proposed remedial measure to close his remaining gambling business as evidence that he continued to operate in the gambling industry post-designation, even though the record identified no post-designation conduct and instead cited the status of prior businesses. AR at 155; SAC ¶¶ 78–79.

Regarding Mr. Bojkov's proposed remedial measures, OFAC concluded that the measures were insufficient, reasoning that Mr. Bojkov's launch of a new political party and his public accusations of corruption against politicians undermined the utility of his proposed public anti-corruption statement. AR at 156–157; SAC ¶¶ 80–82. Further, OFAC cited a determination by the Government of the United Kingdom that he had engaged in serious corruption after his designation. *Id*. OFAC did not assess the reliability of the UK determination nor the evidentiary basis for it, and the denial administrative record contained no explanation of what remedial measures would be sufficient to negate the basis of the designation. SAC ¶¶ 82–83.

## III.    LEGAL STANDARDS

### A.    Summary Judgment Standard

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A dispute

10

is 'genuine' only if a reasonable fact-finder could find for the nonmoving party, and a fact is 'material' only if it is capable of affecting the outcome of the litigation." *King & Spalding LLP v. U.S. Dep't of Health and Human Servs.*, 330 F. Supp. 3d 477, 487 (D.D.C. 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A court may grant summary judgment if "when, viewing the evidence in the light most favorable to the non-movants and drawing all reasonable inferences accordingly, no reasonable jury could reach a verdict in their favor." *Lopez v. Council on Am.-Islamic Relations Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016) (citing *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004)).

When a court reviews agency action under the APA, "[t]he entire case on review is a question of law, and only a question of law." *Zevallos v. Obama*, 10 F. Supp. 3d 111, 117 (D.D.C. 2014) (quoting *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993). In those cases, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Kadi v. Geithner*, 42 F. Supp. 3d 1, 9 (D.D.C. 2012).

B.      *Motion to Dismiss Standard*

"A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a plaintiff's complaint; it does not require a court to 'assess the truth of what is asserted or determine whether a plaintiff has any evidence to back up what is in the complaint.'" *Herron v. Fannie Mae*, 861 F.3d 160, 173 (D.C. Cir. 2017) (quoting *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002)). Courts "must treat the complaint's factual allegations—including mixed questions of law and facts—as true and draw all reasonable inferences therefrom in the plaintiff's favor" when resolving a FED. R. CIV. P. 12(b)(6) motion. *Williams-Jones v. LaHood*, 656 F. Supp. 2d 63, 67 (D.D.C. 2009). In order to survive a motion to dismiss, a complaint must state a facially plausible claim for relief. *Bell Atl.*

11

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court "must not make any judgment about the probability of the plaintiff's success, for a complaint may proceed even if it appears that a recovery is remote and unlikely." *Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 17 (D.C. Cir. 2008).

<b><u>ARGUMENT</u></b>

**I.    OFAC'S DENIAL IS SUBJECT TO RECORD-BASED ARBITRARY AND CAPRICIOUS REVIEW.**

The Government invokes the familiar proposition that arbitrary-and-capricious review is deferential, quoting *State Farm* for the rule that a court may set aside an agency decision only where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43. But the Government relies on only part of *State Farm*. The same decision holds that "the agency must examine the relevant data and articulate a satisfactory explanation for its action, including a 'rational connection between the facts found and the choice made,'" *id.* (quoting *Burlington Truck Lines*, 371 U.S. at 168), and that a reviewing court does not adopt a posture of pure deference but asks "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," *id.* (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285 (1974)). Even deferential review thus requires a reasoned explanation grounded in the record.

That obligation does not disappear simply because the decision touches national security or foreign affairs. The D.C. Circuit has previously set aside OFAC's actions that fail to adhere to the *State Farm* framework, holding that OFAC "failed to offer a sufficient explanation" and "failed

12

to justify its conclusion[s]." *See Epsilon Elecs., Inc. v. U.S. Dep't of Treasury, Off. of Foreign Assets Control*, 857 F.3d 913, 928-29 (D.C. Cir. 2017)*; See also Van Loon v. Dep't of the Treasury*, 122 F.4th 549 (5th Cir. 2024) (rejecting "heightened deference" to OFAC's interpretation of its governing statute and holding that OFAC exceeded its statutory authority); *KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner*, 710 F. Supp. 2d 637, 660 (N.D. Ohio 2010) (finding OFAC's action arbitrary, capricious, and in violation of the APA). Deference, in short, is not abdication.

In every case the Defendants cite, an OFAC denial was upheld only after a reasoned, record-based engagement with the petitioner's submissions. *See Karadzic v. Gacki*, 602 F. Supp. 3d 103, 114 (D.D.C. 2022) (OFAC "scrutinized th[e] evidence" through an "in-depth discussion in the administrative record"); *Zevallos*, 10 F. Supp. 3d at 119–23 (denial supported by multiple categories of present-tense evidence and a reasoned evidentiary memorandum); *Joumaa v. Mnuchin*, 798 F. App'x 667, 668 (D.C. Cir. 2020) (per curiam) (unpublished) (denial sustained where "the record contains substantial evidence that, at the time of his petition and even afterwards," the petitioner continued the sanctioned conduct). The common thread is reasoned engagement, and it is precisely what OFAC's denial of Mr. Bojkov's petition lacks.

Even under the most deferential standard, agency action must be set aside where the agency "entirely failed to consider an important aspect of the problem" or "offered an explanation … that runs counter to the evidence before the agency." *Morall v. DEA*, 412 F.3d 165, 177 (D.C. Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43). OFAC did both: it failed to consider whether coerced payments satisfy the designation criteria, and it treated defunct businesses, an abolished commission, an unadjudicated investigation, and a parallel foreign listing as proof that the basis for designation persists. Because OFAC failed to "'set forth its reasons for

13

decision,'" *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001), the Court should deny the Defendants' motion, hold that OFAC's denial was arbitrary, capricious, and unsupported by substantial evidence, and grant summary judgment to Mr. Bojkov on Count I.

## II. OFAC'S DENIAL OF MR. BOJKOV'S PETITION FOR ADMINISTRATIVE RECONSIDERATION IS ARBITRARY, CAPRICIOUS, AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE IN VIOLATION OF THE APA.

Defendants' argument rests on a strawman. It recites that arbitrary and capricious review is "narrow" and that a court may not "substitute its judgment for that of the agency," Gov't Br. 15 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43), and then resists a request Mr. Bojkov never makes. Mr. Bojkov does not ask the Court to reweigh the evidence or to second-guess OFAC's predictive judgments. He asks the Court to enforce the threshold obligation that even the most deferential review imposes: that the agency actually engage Mr. Bojkov's arguments and supply a reasoned, record-grounded explanation for its conclusions.

Measured against the controlling standard of review, OFAC's denial of Mr. Bojkov's Petition fails on each of the three independent grounds the agency advanced. First, OFAC never confronted the dispositive legal and factual significance of Mr. Bojkov's extortion and coercion evidence, instead recasting it as conceded "bribery." Second, OFAC's analysis rejecting Mr. Bojkov's change in circumstances argument rests on evidence that is either logically disconnected from the conduct underlying the designation or impermissibly conclusory. Third, OFAC's rejection of the proposed remedial measures is unsupported by any reasoned explanation tied to the record. Because the agency "entirely failed to consider an important aspect of the problem" and "offered an explanation . . . that runs counter to the evidence before the agency," the denial must be set aside. *Morall*, 412 F.3d at 177.

14

The heightened deference Defendants invoke in the national security and foreign affairs context does not rescue these defects. That deference governs the weight a court accords the agency's policy and predictive judgments, but it does not relieve OFAC of the APA's threshold duty to engage with Mr. Bojkov's submissions and ground its conclusions in the record. The very authority Defendants lean on sustained OFAC only because the agency had "scrutinized th[e] evidence" through an "in-depth discussion in the administrative record." *Karadzic*, 602 F. Supp. 3d, at 114. That reasoned engagement is precisely what is absent here.

A.      *OFAC Failed to Confront Mr. Bojkov's Extortion and Coercion Evidence, and Instead Substituted a Conclusory Recharacterization of the Conduct as Bribery.*

The Government contends that "[b]oth the Denial Letter and the underlying AR consider Mr. Bojkov's allegations of extortion." Gov't Br. 15. But to "consider" is not the same as to "confront," and the record reflects only the former in name. OFAC's treatment of the extortion theory consists of two conclusory moves, neither of which satisfies the Circuit's requirement that the agency "articulate a satisfactory explanation" for its action. *Tourus Records*, 259 F.3d at 737; *see also Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("conclusory statements will not do; an 'agency's statement must be one of reasoning'" (quoting *Butte County v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010)).

First, OFAC asserted that Mr. Bojkov's "bribery scheme of revoking competitor's gambling licenses demonstrates a 'pattern of practice that calls into question'" his description of an extortion scheme. Gov't Br. 16. That reasoning is circular: it assumes the very characterization—i.e., voluntary "bribery"—that Mr. Bojkov placed in dispute and then deploys that assumption to discard his contrary evidence. OFAC never grappled with Mr. Bojkov's specific, record-supported account that Borisov and Goranov ran a systematic racketeering and coercion enterprise. Specifically, they threatened to dismantle his businesses through nationalizing

15

legislation if he did not pay, called repeatedly when payments were late, warned that "even the smallest state can destroy the biggest business," and threatened him with prosecution and, implicitly, with his life. AR 147. When Mr. Bojkov refused in late 2019, they retaliated with a criminal case, nationalization of the industry, and an attempted abduction in Dubai. *Id*. An agency does not discharge its duty to consider contrary evidence by relabeling it. *See Genuine Parts Co. v. EPA*, 890 F.3d 304, 311–12 (D.C. Cir. 2018) (agency action is arbitrary where the agency entirely fails to address record evidence that runs counter to its decision).

The omission is not merely semantic; it reflects the difference between the two distinct offenses that the agency conflated. Bribery is "[t]he corrupt payment, receipt, or solicitation of a private favor for official action." *Bribery*, Black's Law Dictionary (12th ed. 2024). Extortion, by contrast, is "[t]he offense committed by a public official who illegally obtains property under the color of office." *Extortion*, Black's Law Dictionary (12th ed. 2024). The dividing line turns on who took the initiative. Specifically, "[i]f one other than the officer corruptly takes the initiative and offers what he knows is not an authorized fee, it is bribery and not extortion. On the other hand, if the officer corruptly makes an unlawful demand which is paid by one who does not realize it is not the fee authorized for the service rendered, it is extortion and not bribery." *Id.* (quoting Rollin M. Perkins & Ronald N. Boyce, Criminal Law 538 (3d ed. 1982)); *accord Addonizio*, 451 F.2d at 72 ("[W]hile the essence of bribery is voluntariness, the essence of extortion is duress.")

OFAC never attempted the inquiry that the dividing line demands. It did not identify any record evidence that Mr. Bojkov "took the initiative" and offered an unauthorized fee; rather, it assumed as much. That assumption is the whole of its "bribery" finding, and it is precisely the initiative and demand question the agency was obligated to resolve before it could label coerced payments as voluntary bribes.

16

Second, OFAC reasoned that "even if [Mr. Bojkov's] assertion that the corruption scheme . . . was extortion" is accepted, "this allegation is not exculpatory." Gov't Br. 16. This, according to OFAC, is because he "did not disprove, let alone dispute, the existence of the bribery scheme itself in other instances, was an active participant in it, and indeed enjoyed significant profits from such scheme." *Id*. That confirms, rather than cures, the failure of reasoning. The operative question under E.O. 13818 is whether Mr. Bojkov "materially assisted, sponsored, or provided . . . support for . . . corruption" or "bribery." E.O. 13818 § 1(a)(iii)(A)(1), 82 Fed. Reg. 60,839 (Dec. 26, 2017). If the payments were coerced such that Mr. Bojkov was the victim of a racketeering enterprise run by government officials rather than a sponsor of corruption, the conduct does not meet the designation criteria. As a result, OFAC was obligated to explain why coerced payments nonetheless constitute material assistance or support for corruption or bribery under the Order. The agency never undertook that analysis. It assumed the answer ("the bribery scheme itself") without examining the coercion evidence. In other words, it provided an "explanation . . . that runs counter to the evidence before the agency." *Morall*, 412 F.3d at 177.

That is a legal question that turns on the meaning of the Order's operative terms, and the Court owes OFAC no deference in resolving it. Per *Loper Bright Enterprises v. Raimondo*, the APA requires a reviewing court to "decide all relevant questions of law" by exercising its "independent judgment," and agencies receive no deference simply because their construction is reasonable. 603 U.S. 369, 391–95 (2024). Courts have applied that command to OFAC itself.

Specifically, in *Van Loon v. Department of the Treasury*, the Fifth Circuit declined to give "heightened deference" to OFAC's interpretation of its governing statute and construed the statutory terms independently. 122 F.4th 549 (5th Cir. 2024). The meaning of the Order's designation criteria likewise presents a legal, not a factual, question. OFAC's threshold

17

determination that coerced payments constitute material assistance or support for corruption or bribery is therefore for the Court, not the agency, to resolve, and the agency may not convert that contested question of law into a deference-backed factual finding by relabeling coercion as bribery.

Although *Loper Bright* overruled Chevron deference, even if some residual deference to OFAC's interpretation survived under *Auer v. Robbins*, 519 U.S. 452 (1997), none would attach here. Under *Kisor v. Wilkie*, a court may defer to an agency's reading of its own regulation only if the regulation is "genuinely ambiguous," the reading is "reasonable," and the interpretation reflects the agency's "authoritative," "expertise-based," and "fair and considered judgment." 588 U.S. 558, 573–79 (2019). OFAC's characterization of "bribery" clears none of these thresholds.

The designation criteria are not ambiguous as applied to a victim of official extortion: a person from whom payments are coerced under threat of financial ruin, prosecution, and violence does not materially assist or support the very corruption to which he is subjected. Nor is OFAC's contrary reading the product of considered judgment. Instead, it is a conclusory, post hoc relabeling advanced only to discard the coercion evidence. A label the agency cannot defend through reasoned decision-making is not entitled to deference and cannot supply the explanation required by the APA.

OFAC's premise that Mr. Bojkov having "enjoyed significant profits from such scheme" forecloses the extortion account rests on a legal error the courts have rejected. Taken to its conclusion, that logic would make every payment to a public official from which the payer derived any benefit a bribe, regardless of coercion. But a victim of extortion remains a victim even when he benefits from the corrupt transaction. Courts have previously reasoned, "Such conduct is no less extortion because the 'victim' may in some sense receive an economic benefit when the public official neglects his duty." *United States v. French*, 628 F.2d 1069, 1074 (8th Cir. 1980); *see also*

18

*United States v. Thompson*, 647 F.3d 180, 187 (5th Cir. 2011) (Hobbs Act liability "should not turn on the value of the deal obtained by extorted victims"); *United States v. Rivera-Rangel*, 396 F.3d 476, 483 (1st Cir. 2005) (a payer who fears the loss of business opportunities is a victim even where he initiates contact). These authorities dispose of OFAC's "not exculpatory" rationale: that Mr. Bojkov paid and profited says nothing about whether he was a sponsor of corruption or its victim. The agency was obligated to decide which, and it did not.

Moreover, OFAC's reliance on the arithmetic of Mr. Bojkov's profits underscores, rather than cures, this error. The denial memorandum reasons that because Mr. Bojkov allegedly paid roughly 45 million euros between 2015 and 2019 while retaining approximately 180 million euros for himself, his payments "did in fact cause the officials to act in [his] favor." AR 152 & n.20. But the ratio of what Mr. Bojkov kept to what he was made to pay is not a test for distinguishing a bribe from a coerced tribute. A protection-racket victim who earns a profit on the business the racketeers permit him to operate is no less a victim, and the size of the margin retained proves only that his enterprise was lucrative, not that he took initiated an unlawful payment rather than submitting to an official demand. *See French*, 628 F.2d at 1074; *see also Rivera-Rangel*, 396 F.3d at 483. That Mr. Bojkov's regulated gambling businesses "generated significant profits" for him "while the payments were being made," AR 152, is exactly what one expects when officials extract a share of a going concern in exchange for leaving it standing. It is the extortion mechanism that Mr. Bojkov described, not evidence that the payments were volunteered. By treating Mr. Bojkov's retained profit as though it answered the initiative and demand question, OFAC "offered an explanation … that runs counter to the evidence before the agency." *Morall*, 412 F.3d at 177.

This Circuit has set aside agency action for precisely this defect. In *Morall*, the D.C. Circuit vacated a DEA order as "stunningly one-sided in its focus and, thus, utterly arbitrary and

19

capricious" because the agency "fail[ed] to consider contradictory record evidence where such evidence is precisely on point." 412 F.3d at 167. So too here. Mr. Bojkov's evidence of coercion is not collateral, but it goes to the heart of whether the designated conduct ever met the criteria. OFAC's decision to credit only the evidence supporting its predetermined bribery conclusion, while passing over the contrary materials in its own record, is the "lapse of reasonable and fair decisionmaking" that *Morall* held could not survive review. *Id.*

The Government's reliance on the former SCG Chairman's purported "confession to initiating schemes to help [Mr. Bojkov]," Gov't Br. 16 (citing AR 153), only sharpens the defect. A confession that officials "initiat[ed]" schemes "to help" Mr. Bojkov is at least as consistent with Mr. Bojkov's coercion account—officials initiating and controlling the scheme—as with OFAC's voluntary bribery theory. Where the agency's own evidence is equally susceptible to Mr. Bojkov's reading, the agency must explain why it drew the contrary inference. It cannot simply announce the one that favors its conclusion. *See Morall*, 412 F.3d at 177–79.

OFAC's selective development of the record compounds the problem. Mr. Bojkov identified contemporaneous Facebook posts characterizing the payments as part of the extortion racket, but OFAC relied on a single June 17, 2020 post while ignoring the others. This is even though that very post reflects Mr. Bojkov's account that the roughly BGN 67 million (approximately $37,874,505) he withdrew was money he was made to hand over to Borisov and Goranov, AR 143–44 (Ex. 1, pp. 3–4). This is even though Mr. Bojkov expressly contended that OFAC had cherry-picked that single post while disregarding his other contemporaneous statements characterizing the payments as part of the extortion racket, AR 147 (Ex. 12, pp. 5–6)—and offering no indication that it weighed the coercion-related materials at all. AR 143–44 (Ex. 1, pp. 3–4).

20

Defendants' cited authorities confirm the point. Its response that OFAC "need not further explain why Mr. Bojkov's proposed evidence is insufficient," Gov't Br. 17, misstates the obligation. The agency need not write a treatise, but it must demonstrate that it actually confronted the central contrary evidence. That is the lesson of the Government's lead case: *Karadzic* credited OFAC precisely because it engaged in an "in-depth discussion in the administrative record" and "scrutinized th[e] evidence." 602 F. Supp. 3d at 114. *Zevallos* is to the same effect.

There, the Plaintiff argued that OFAC relied on "outdated, biased, and incredible sources," and the court declined to "reweigh the evidence." 10 F. Supp. 3d at 123 n.9. Mr. Bojkov makes no such request. He does not ask the Court to deem the agency's sources incredible and substitute its own credibility judgment. Instead, he contends that OFAC never performed the threshold analysis, that it recharacterized his evidence of coercion without any reasoning, and that it ignored contrary materials in its own record. *Zevallos* sustained a denial precisely because OFAC there supplied substantial evidence and a reasoned memorandum addressing the petitioner's arguments. *Id.* at 119–23. The existence of a record is not the same as reasoned decision-making, and it is the latter that the APA demands.

Finally, the Government's remaining points do not fill the analytical gap. That Mr. Bojkov is, in the agency's words, "Bulgaria's richest man[,] with significant influence," AR 152, does not make him incapable of being extorted. Wealth and influence are not defenses that an extorting official may assert, and they do not convert a coerced payment into a voluntary one. Nor is the fact of payment dispositive. It is undisputed that payments were made, but those payments are evidence of the transaction's outcome, not proof that Mr. Bojkov voluntarily assisted, sponsored, or supported corruption or bribery rather than submitted to a demand. On that dispositive question, the record contains evidence of coercion that the agency never confronted. Sustaining the

21

designation on this record would punish the extorted party for the misfortune of being extorted, reward the corrupt officials who made the demands, and penalize their victim, the opposite of what E.O. 13818 was designed to accomplish.

>    B.    *OFAC's Change in Circumstances Determination Rests on Evidence That Is Either Disconnected From the Basis for Designation or Impermissibly Conclusory.*

OFAC's second rationale, that Mr. Bojkov failed to demonstrate a change in circumstances sufficient to warrant removal, suffers from the same defect as its first: the agency's stated reasons supply no "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. Under OFAC's procedures, a designated person may obtain delisting by showing "that the circumstances resulting in the designation no longer apply." 31 C.F.R. § 501.807. The D.C. Circuit has distilled the petitioner's burden to a single question: whether "the 'rationale' behind his original designation 'was never true or is no longer true.'" *Joumaa* 798 F. App'x at 668 (quoting *Zevallos*, 793 F.3d at 110).

As the designation press release explains, Mr. Bojkov was designated for bribery directed at the now-abolished SCG and its Chairman in connection with his Bulgarian gambling businesses. *Treasury Sanctions Influential Bulgarian Individuals and Their Expansive Networks for Engaging in Corruption*, June 2, 2021. Specifically, Mr. Bojkov was designated for paying the then-Chair of the SCG the equivalent of thousands of dollars per day, beginning in February 2018, to have his competitors' gambling licenses revoked. *Id*.

Mr. Bojkov identified four concrete, record-supported changes that strike at the mechanism of that conduct: (1) the abolition of the SCG; (2) the nationalization of the Bulgarian lottery industry; (3) the insolvency and defunct status of his lottery businesses; and (4) the severance of his ties to the relevant Bulgarian officials. *See* AR 149 (summarizing Mr. Bojkov's asserted changes in circumstances). If the SCG no longer exists, the industry has been nationalized, the

licensing apparatus he allegedly corrupted is gone, and his businesses are defunct, then the very channel through which the alleged bribery occurred has been eliminated. OFAC was therefore required to "examine the relevant data and articulate a satisfactory explanation" for why those changes are nonetheless insufficient. *State Farm*, 463 U.S. at 43. It did not, but instead it pointed to evidence that does not answer the question.

OFAC relied first on the assertion that Mr. Bojkov "remains under investigation in Bulgaria for various alleged criminal activities, including those that involve the same activities that formed the basis of his designation," AR 139–40, citing a July 5, 2024 article reporting that the Sofia City Court opened a case against him, AR 157; Gov't Br. 17. But an open, unadjudicated investigation does not establish that the designation criteria continue to be satisfied; it establishes only that an accusation exists. The D.C. Circuit has remanded a designation determination for precisely this reason, faulting the agency's unexplained reliance on an unadjudicated indictment and other sources whose relevance to the statutory criteria the agency never established. *People's Mojahedin Org. of Iran v. United States Dep't. of State*, 613 F.3d 220, 230–31 (D.D.C. July 16, 2010).

Further, this Court has held that the mere possibility of satisfying designation criteria cannot constitute substantial evidence of their satisfaction. *Luokung Tech. Corp. v. U.S. Dep't of Def.*, 538 F. Supp. 3d 174, 182 (D.D.C. 2021) (concluding that "a reasonable mind could not accept" the agency's memorandum as adequate support for its designation); *accord Xiaomi Corp. v. Dep't of Def.*, No. 21-280 (RC), 2021 WL 950144, at *8 (D.D.C. Mar. 12, 2021) (reasoning that treating dual-use potential as sufficient "could result in a situation where any Chinese company involved in technology that has alternative military uses could be designated"). OFAC nowhere explained how the pendency of a foreign proceeding, particularly one Mr. Bojkov contends is a retaliatory sham brought by the very officials who extorted him, shows that the circumstances of

23

his designation have not changed. Treating an unproven foreign charge as proof of the underlying conduct, without analysis, both "runs counter to the evidence before the agency" and "fail[s] to consider contradictory record evidence where such evidence is precisely on point." *State Farm*, 463 U.S. at 43; *Morall*, 412 F.3d at 177.

The agency's chosen source refutes the very inference OFAC drew from it. The July 5, 2024, article OFAC cited reports that Mr. Bojkov was "brought to court as an instigator with the complicity of officials from the Bulgarian SCG," and that the former finance minister was "also questioned in the case." AR 157 (Ex. 24, p. 1). That description names the same Bulgarian official whom Mr. Bojkov identified as his extorter as complicit in the scheme, precisely the account of official coercion that OFAC elsewhere refused to confront. An agency may not rely on a document for a proposition that its own text undercuts, and OFAC nowhere reconciled its use of the Sofia City Court proceeding as proof of Mr. Bojkov's voluntary corruption with that proceeding's own framing of Bulgarian officials as the culpable actors. See *Morall*, 412 F.3d at 177–79 (agency may not credit only the reading of its own evidence that favors its conclusion while passing over the contrary import of the same materials).

Defendants may argue that OFAC is entitled to rely on "unverified open source materials like news media reports," *Zevallos* 793 F.3d at 112, but Mr. Bojkov does not contend otherwise. That OFAC may consider press reporting does not mean it may draw from an article an inference the article's own text contradicts or credit a source's accusatory framing while ignoring its exculpatory content. The question on review remains whether the record "supports the [agency's] ultimate decision," *id.* at 114 (citation omitted), and an article reporting that the official Mr. Bojkov identifies as his extorter was complicit in the charged scheme does not support the conclusion that Mr. Bojkov remains a voluntary participant in corruption. *Epsilon Electronics* confirms that even

a deferential substantial evidence review has teeth where the inference the agency draws from its materials is unsupported. There, the D.C. Circuit set aside OFAC's determination because the agency "failed to offer a sufficient explanation" for the conclusion it drew from the record. 857 F.3d at 925, 928-29.

OFAC relied next on Mr. Bojkov's acknowledgment that, post-designation, he "operated business enterprises in the gambling sector, in which [he] had previously engaged in corrupt activities." AR 155. But operating in the gambling sector is not the basis of Mr. Bojkov's designation; he was designated for bribery of Bulgarian officials, not for being a gambling entrepreneur. The officials are gone, the commission he allegedly corrupted has been abolished, and OFAC identified no evidence that any post-designation gambling activity involved bribery, corruption, or material assistance to corrupt officials. The same defect infects OFAC's reliance on Mr. Bojkov's launch of a new political party. Notably, OFAC's own denial memorandum states that Mr. Bojkov's "registration of a political party was not used in the basis for [his] designation" and that his assertions on that subject are therefore "not germane to the request for reconsideration." AR 153–54. Political activity that the agency itself states was not used in the basis for the designation cannot demonstrate that the sanctionable conduct persists. The agency's premise that continued presence in the same industry or continued political activity—which the agency states was not part of the basis for designation—proves the basis for designation persists is the type of inferential leap the APA forbids, absent a reasoned explanation. *See Luokung*, 538 F. Supp. 3d at 182; *State Farm*, 463 U.S. at 43.

OFAC further reasoned that "it is possible [Mr. Bojkov] continues to benefit from the proceeds of corruption earned in that time, given that [he] has not paid any form of financial restitution and admits his access to funds earned before his designation." AR 155. That rationale

fails on two independent grounds. First, it is conjecture on its face: OFAC assessed only that continued benefit is "possible," and the mere possibility that the designation criteria are satisfied cannot constitute substantial evidence of their satisfaction. *See Luokung*, 538 F. Supp. 3d at 182-83; *Xiaomi*, 2021 WL 950144, at *8.

Second, continued access to previously earned funds is not the conduct for which Mr. Bojkov was designated. The sanctions criteria OFAC invoked reach someone who has "materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of" corruption or "bribery that is conducted by a foreign person." E.O. 13818 § 1(a)(iii)(A)(1); AR 151. Passively retaining access to funds earned before designation does not "assist," "sponsor," or "support" corruption by anyone. Nor did OFAC identify any specific asset, dealing, or transaction traceable to the alleged corruption, request restitution or question Mr. Bojkov's sources of wealth or dealings in proceeds of corruption at any point during the four-year reconsideration, or explain how retained earnings demonstrate that the circumstances that resulted in the designation still apply. 31 C.F.R. § 501.807. Speculation untethered to the designation criteria cannot supply the "rational connection between the facts found and the choice made" that the APA requires. *State Farm*, 463 U.S. at 43.

OFAC likewise faulted Mr. Bojkov on the ground that, "despite [his] allegations that he is not involved in the lottery business in other countries besides Bulgaria, namely Moldova and Georgia, he has not provided any evidence that he has not had any lottery businesses or related dealings in those countries." AR 155. That reasoning demands that Mr. Bojkov prove a negative––i.e., that he documents the nonexistence of businesses he denies having. Instead, Mr. Bojkov did what the delisting procedures require. He submitted arguments or evidence, denied any lottery involvement in Moldova or Georgia in his questionnaire responses, and explained that the contrary

26

media reporting was inaccurate and its credibility should be questioned. AR 154–55 n.22. OFAC, by contrast, identified no affirmative record evidence, such as a license, corporate registration, or transaction, that any such business exists. Discounting a petitioner's direct, responsive denials solely because he cannot corroborate an absence inverts the substantial-evidence standard, which "requires more than a scintilla" of affirmative support, *Epsilon Elecs.*, 857 F.3d at 925, and passes over "contradictory record evidence" that is "precisely on point." *Morall*, 412 F.3d at 167.

OFAC's own denial memorandum confirms just how narrow the basis for the designation is and thus how far afield its change in circumstances rationale reaches. In responding to Mr. Bojkov's arguments, the memorandum states that the alleged plan to create a channel for Russian influence "was not used in the basis for [Mr. Bojkov's] designation." It further noted that Mr. Bojkov's "registration of a political party was not used in the basis for [his] designation," and that "[i]nformation regarding [Mr. Bojkov's] extradition status was not used as a basis for [his] designation," deeming each argument "not germane" to the reconsideration. AR 153–54.

Having stated that the registration of a political party was not used in the basis for the designation, OFAC cannot then rely on Mr. Bojkov's post-designation launch of a new party as evidence that the sanctionable conduct persists. In other words, a fact the agency states was not used in the basis of designation cannot simultaneously supply evidence that the basis endures. OFAC's own statements leave only the bribery-related conduct as the operative basis—i.e., the very conduct whose entire mechanism (the SCG, the licensing regime, Mr. Bojkov's lottery businesses, and the officials involved) Mr. Bojkov has shown to be dismantled. OFAC's failure to explain why the elimination of that mechanism is insufficient, while relying on matters it states were not used as a basis for designation, is the hallmark of a decision that "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

27

OFAC relied finally on the United Kingdom's February 10, 2023 designation of Mr. Bojkov under its Global Anti-Corruption Sanctions Regulations. AR 157. But a parallel foreign listing is not independent record evidence of the underlying conduct. Instead, like the foreign proceeding, it is another government's conclusion, resting—so far as this record reflects—on the same allegations underlying OFAC's designation. Crediting it as corroboration is bootstrapping. Indeed, it supplies no new facts and cannot furnish the "rational connection between the facts found and the choice made" that the agency otherwise lacks. *State Farm*, 463 U.S. at 43. OFAC remained free to weigh the UK listing, but it was not entitled to treat that listing as though it corroborated facts the domestic record never independently established.

The Government's invocation of *Karadzic* for the proposition that OFAC "need not further explain why Mr. Bojkov's proposed evidence is insufficient," Gov't Br. 17 (quoting 602 F. Supp. 3d at 114), proves the opposite of what the Government claims. *Karadzic* sustained OFAC's denial for two reasons, both absent here. First, the agency there had present-tense evidence of continued sanctionable conduct. Specifically, the court emphasized that OFAC "did not rest only on historical evidence" but relied on recent conduct, including a 2019 statement in which the petitioner denied his brother's genocidal intentions and branded the Hague Tribunal "illegitimate and illegal", which "provide[d] OFAC an independent basis to continue the sanctions." 602 F. Supp. 3d 103, 115. Second, OFAC actually engaged the petitioner's change in circumstances argument and explained its reasoning "in-depth," such that it "scrutinized th[e] evidence. That is all the law requires of it." *Id.* at 114. Strip away those two features, as the record here does, and nothing in *Karadzic* permits OFAC to maintain a designation by reciting an unadjudicated investigation, industry presence untethered to the designated conduct, and a parallel foreign listing, while never explaining why the elimination of the bribery mechanism is insufficient.

28

The Government's deeper premise that OFAC may maintain a designation resting on historical conduct speaks only to OFAC's legal authority, not to whether its exercise of that authority here was the product of reasoned decision-making. This Court recently drew that very distinction in the OFAC context, explaining that it was "comforted by the possibility that an individual designation—even if consistent with the Government's legal authority—can still be challenged as arbitrary and capricious under the APA." *Diegelmann v. Yellen*, No. 24-1090 (JEB), 2024 WL 4880468, at *6 (D.D.C. Nov. 25, 2024). The court grounded that distinction in controlling D.C. Circuit authority: "Agency action may be consistent with the agency's authorizing statute and yet arbitrary and capricious under the APA. The court's inquiry on the latter point depends not solely on the agency's legal authority, but instead on the agency's ability to demonstrate that it engaged in reasoned decisionmaking." *Id.* (quoting *Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 619 (D.C. Cir. 2017)). Even accepting *arguendo* that OFAC possessed the authority to maintain Mr. Bojkov's designation on the basis of past conduct, that authority does not shield the denial from arbitrary and capricious review. The question is not whether OFAC could have maintained the designation, but whether the denial it issued reflects the reasoned decision-making the APA demands. It does not.

Nor does *Karadzic*'s holding that "past conduct alone is sufficient for maintaining sanctions" supply the missing reasoning. 602 F. Supp. 3d at 114. That holding answers a different question. It establishes that OFAC has the authority to keep a person designated even after the original circumstances change, because "sanctions can serve various foreign policy goals" and "it is not unreasonable that sanctions could maintain their usefulness even if the original reasons for implementing them no longer apply." *Id.* But *Karadzic* did not sustain OFAC on past conduct standing alone. The court stressed that OFAC "did not rest only on historical evidence" and "relied

29

on recent conduct, too," pointing to present-tense statements by the petitioner, and it credited the agency only after finding that OFAC had "scrutinized th[e] evidence" through an "in-depth discussion in the administrative record." *Id.* at 114–15.

The authority to maintain a designation on historical conduct is thus not a license to do so without explanation. Thus, even where OFAC may rely on past conduct, it must still "examine the relevant data and articulate a satisfactory explanation" connecting that conduct to the continued need for sanctions. *State Farm*, 463 U.S. at 43. Here, OFAC never explained why the designated bribery, whose entire mechanism (the SCG, the licensing regime, Mr. Bojkov's lottery businesses, and the relevant officials) has been dismantled, continues to serve any sanctions purpose. That omission distinguishes this case from *Karadzic* and returns the analysis to the reasoned decision-making defect identified above. Accordingly, because the administrative record establishes that the rationale for Mr. Bojkov's designation "is no longer true," *Joumaa*, 798 F. App'x at 668, and that OFAC failed to engage that showing with reasoned decisionmaking, the denial is arbitrary, capricious, and unsupported by substantial evidence. 5 U.S.C. § 706(2)(A), (E).

C.    *OFAC's Rejection of the Proposed Remedial Measures Is Conclusory and Unsupported by Reasoned Decisionmaking.*

OFAC's third rationale that Mr. Bojkov's proposed remedial measures "would not negate the basis for designation" fails for the same reason. Over the course of the reconsideration proceeding, Mr. Bojkov proposed a detailed and escalating series of remedial commitments to be incorporated into a TOR. These included closing his remaining gambling businesses; submitting to a financial audit and ongoing compliance oversight in partnership with OFAC; ceasing all transactions with SDNs and Bulgarian officials; providing ongoing documentation of his holdings; complying with applicable anti-money-laundering and anti-corruption measures; and making substantial anti-corruption donations. *See* AR 150–51 (summarizing proposed remedial measures).

OFAC responded that the proposed remedial measures "are insufficient to negate [Mr. Bojkov's] basis for his designation." AR 155–56. Further, OFAC stated that it has "not seen evidence that [Mr. Bojkov] has moved past the businesses and activities forming the basis of his designation." *Id*. Finally, OFAC found that the proposed TOR provisions "do not provide OFAC with adequate assurances;" "do not adequately address the past conduct for which [Mr. Bojkov] was designated[,] and would not prevent [Mr. Bojkov] from, in the future, engaging in the sanctionable activity that led to his designation." *Id*.

Beyond pointing to Mr. Bojkov's launch of a new political party and his public accusations of corruption against other politicians, and to the United Kingdom's determination, both of which were previously addressed, the memorandum offers no analysis of the specific measures proposed. A conclusory statement that the measures are "insufficient"—untethered to any analysis of which measures fall short, and why—is not reasoned decision-making. The Circuit requires the agency to "set forth its reasons for decision," and its "failure to do so constitutes arbitrary and capricious agency action." *Tourus Records*, 259 F.3d at 737 (quoting *Roelofs v. Secretary of the Air Force*, 628 F.2d 594, 599 (D.C. Cir. 1980)). OFAC was obligated to explain why a binding, verifiable commitment to exit the gambling industry, submit to audit, and sever the relevant relationships does not address conduct that, by the agency's own account, was tied to that industry and those relationships. Its failure to engage the substance of the proposed TOR is itself arbitrary and capricious and thus its denial should be deemed unlawful.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss or, in the alternative, motion for summary judgment, grant Mr. Bojkov's motion for summary judgment, and enter judgment in favor of Mr. Bojkov on all claims.

31

Dated: July 10, 2026

Respectfully submitted,

/s/ Erich C. Ferrari
Erich C. Ferrari, Esq.
Ferrari & Associates
1455 Pennsylvania Ave., NW
Suite 400
Washington, D.C. 20004
Telephone: (202) 280-6370
Fax: (877) 448-4885
Email: ferrari@falawpc.com
D.C. Bar No. 978253

*Attorney for Plaintiff*

32